ESTATE OF JAMES H. GRAHAM, DECEASED, LIBERTY NATIONAL BANK AND TRUST COMPANY OF LOUISVILLE, EXECUTOR, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4155-64. Filed June 23, 1966.

*H. Gilmer Wells* and *Arnold J. Zurcher, Jr.*, for the petitioner.
*William F. Chapman*, for the respondent.

SIMPSON, *Judge:* The respondent determined a deficiency in estate tax in the amount of $151,256.13. The ultimate issue in this case is

---

whether all or any part of the corpus of an inter vivos trust created by James H. Graham in 1929 is includable in his gross estate.

### FINDINGS OF FACT

Most of the facts were stipulated and those facts are so found.

Petitioner is the duly qualified executor of the Estate of James H. Graham, who died a resident of Jefferson County, Ky., on June 24, 1960. The U.S. Estate Tax Return was filed with the district director of internal revenue, Louisville, Ky., on September 22, 1961.

The statutory notice of deficiency, dated June 2, 1964, asserts:

It is held that the value of the James H. Graham Trust Account #U806, Liberty National Bank & Trust Co., Trustee, is includible in its entirety in the gross estate of decedent.

The fair market value of the assets comprising the corpus of the above trust as of the date of decedent's death was $568,594.48.

The decedent and his wife, Mary Gloster Graham, entered into a trust agreement on October 5, 1929, with the United States Trust Co. (now Liberty National Bank & Trust Co. of Louisville) pursuant to which certain real property (the Graham Farm) located in the State of Kentucky, together with its improvements and tangible personalty, and 3,000 shares of the common stock of the Indian Refining Co. were transferred to the Trust Co., as corporate trustee, and to the decedent, as individual trustee. On October 25, 1929, the decedent and his wife conveyed certain real property located in Gulfport, Miss., to the trust, and at no time after this did decedent make any additional transfers to the trust.

The stated purpose of the trust was to provide a home on the Graham Farm for the use of the decedent, his wife, and his two daughters, Mary Graham Fritts and Martha Graham Gerstle, and their families. The trustees, acting jointly and in their discretion, were authorized to "invest, sell, reinvest and otherwise deal in and with" the corporate securities held in the trust (the "endowment") and to reduce the endowment for any of the purposes of the trust, but the value of the endowment could not be reduced below $100,000. The trustees were further authorized jointly to accept from the individual trustee the income from any part of the trust estate to increase the endowment, to receive and hold additional items of property, and after the trust had been effective for 15 years, to sell land not to exceed 150 acres from the farm (not to include the portion of the farm on which the Graham home was located), but the proceeds of any such sale could not be used for current expenses.

The trust instrument granted the individual trustee control, as general manager, of the management and operation of the farm and the personalty. The individual trustee was to receive the income from the endowment currently or periodically, using all current income

from the trust estate in his discretion. He was also authorized to sell, in his discretion, any part of the personalty and deal with the proceeds in his discretion. The individual trustee was, however, limited in the use of the proceeds of any part of the trust estate and was under a duty to use those proceeds to (a) manage and operate the farm, (b) maintain the home on the farm with a housekeeper in residence, (c) maintain the farm in a fair state of cultivation and fertility, with a superintendent in residence, (d) maintain all buildings and pay taxes and keep insurance thereon, (e) keep farm stock, implements, and other personalty on the farm approximately equivalent to their original value or earning power, (f) provide in moderate amounts for the amusement and comfort of any members of the family while they were sojourning at the farm, (g) determine who should occupy the home and other buildings on the farm, (h) in his discretion sell or dispose of any or all items of personalty on the farm and purchase additional items, and (i) in his discretion give for charitable uses all or any portion of the produce of the farm.

The trust was specifically stated to be irrevocable and would terminate on the death of the last survivor of the following: The decedent, James H. Graham; his wife, Mary Gloster Graham; his two daughters, Mary Graham Fritts and Martha Graham Gerstle; his grandson, James Graham Fritts; and his granddaughter, Martha Jean Fritts. No provision was made for the disposition of the trust assets in the event of termination of the trust at the end of the six-named measuring lives.

Article III of the trust agreement provided in part:

At any time after the expiration of six years from the death of the survivor of James H. Graham and Mary Gloster Graham, his wife, then the said Mary Graham Fritts and Martha Graham [Gerstle], jointly, or the survivor of them, shall have the power to terminate the trust, and thereupon the trust estate shall be liquidated and distributed according to the provisions of the last will and testament of said James H. Graham, or, in the absence of such provisions, then among the heirs at law of said James H. Graham in the proportions in which they may be entitled to inherit from him, according to the laws of the state of Kentucky then in force.

The circumstances of the Graham family changed radically over the years with the decedent's wife and both daughters living in New York or New Jersey by 1952. In February of that year, the trustees jointly instituted a proceeding in the Circuit Court of Jefferson County, Ky., Chancery Branch, No. 333,146, petitioning that court to exercise its equity powers to reform certain of the provisions of the trust agreement. The judgment of the court, entered on February 18, 1952, relieved the trustees of the duty of managing and operating the farm and of the duty of maintaining a home as a residence for members of the family and required the individual trustee, with the advice and counsel of the corporate trustee, thereafter, to use only so much

of the income of the trust as was necessary to preserve the property and the value thereof. The trustees were authorized to rent the residence located on the farm. The corporate trustee could retain a reasonable amount of income in anticipation of future necessary expenditures and could pay a portion of the income, not to exceed one-third thereof, to provide for the household or living expenses of James H. Graham and Mary Gloster Graham. The remaining income was to be paid by the corporate trustee, "after advising with the individual trustee," to Mary Graham Fritts and to Martha Graham Gerstle, in approximately equal proportions as the household or living expenses of themselves and their families indicated to be in the best interest of the family as a whole. If in the judgment of the corporate trustee, "after advising with the individual trustee," any part of the income was not needed by any of the beneficiaries, it could be retained and invested and distributed at a later time when the needs of the family required.

In 1953 and 1954, the trustees petitioned the Jefferson Circuit Court, Chancery Branch, for permission to sell, first, a 4-acre tract including the Graham residence, and, second, the remaining real estate held by the trust. The court granted its permission, and the proceeds from the sales were reinvested as part of the trust principal.

The decedent's wife, Mary Gloster Graham, predeceased the decedent. The two daughters survived the decedent and are the present income beneficiaries of the trust. After the decedent's death, one daughter, Mary Graham Fritts, succeeded him as individual trustee and continues to serve in that capacity.

The decedent's last will and testament, admitted to probate on September 11, 1961, expressly failed to exercise the power of appointment retained by the decedent in article III of the trust agreement.

### OPINION

Respondent maintains that at least a portion of the trust created by decedent in 1929 is includable in decedent's gross estate under each of sections 2033, 2037, and 2038 [1] of the Internal Revenue Code of 1954.[2]

---

[1] There are two other sections of the Code that might in other, but similar, circumstances be applicable to facts such as those in this case. Sec. 2036(a) provides that the value of a decedent's gross estate shall include the value of all property to the extent of any interest therein of which the decedent has made a transfer retaining for his life the possession or enjoyment of, or the right to the income from, the property, or the right, either alone or in conjunction with any person, to designate those persons who shall possess or enjoy the property or the income from the property. However, sec. 2036(b) provides that sec. 2036(a) shall not apply to a transfer, such as that in the present case, made before Mar. 4, 1931.

Sec. 2041, in general terms, provides that the value of the gross estate shall include the value of all property with respect to which the decedent has a general power of appointment. However, in the case of a power created on or before Oct. 21, 1942, only property with respect to which a general power of appointment is exercised by the decedent is included in his gross estate.

[2] All statutory references are to the Internal Revenue Code of 1954 unless otherwise indicated.

Section 2033, at the date of decedent's death, provided that:

SEC. 2033.  PROPERTY IN WHICH THE DECEDENT HAD AN INTEREST.

The value of the gross estate shall include the value of all property (except real property situated outside of the United States) to the extent of the interest therein of the decedent at the time of his death.[3]

Both parties agree that the existence and nature of any interests of the decedent in property must be determined under State law—in this instance, the law of the State of Kentucky. *Freuler* v. *Helvering*, 291 U.S. 35 (1943); *Estate of Wilhelmina L. Benjamin*, 44 T.C. 598 (1965).

The parties further agree that, since the trust instrument made no provision for the disposition of the trust assets upon the termination of the trust at the end of the six-named measuring lives, the trust assets would at that time revert to the estate of the decedent.  This reversionary interest is property possessed by the decedent at his death. However, petitioner asserts that there is no recognized method of valuing this interest because of the power possessed by the decedent's daughters to terminate the trust.

At the trial of this case, petitioner introduced expert testimony to the effect that, because the possibility of the daughters' terminating the trust cannot be actuarially determined, the full value of the decedent's reversionary interest cannot be ascertained.  By assuming that neither daughter survives the decedent or his wife by the necessary 6 years, a minimum value of $1,488.58 can be determined for such reversionary interest.

The respondent submits that decedent has a reversionary interest regardless of whether the trust is terminated by the two daughters. Respondent points to article III of the trust agreement providing that if the daughters do terminate the trust, the trust estate will be distributed:

according to the provisions of the last will and testament of said James H. Graham, or, in the absence of such provisions, then among the heirs at law of said James H. Graham in the proportions in which they may be entitled to inherit from him, according to the laws of the state of Kentucky then in force.

Respondent argues that since decedent did not exercise his testamentary power of appointment, the trust estate will pass to decedent's heirs at law if the daughters terminate the trust.  Since the existence and nature of any property rights the decedent might have is determined by State law, respondent would apply the common law "doc-

---

[3] Sec. 2033 was amended in 1962 by deleting the phrase "(except real property situated outside of the United States)."

420

trine of reversions"[4] that an inter vivos conveyance for life, with an attempted remainder to the heirs or next of kin of the conveyor, is ineffective to create a remainder but leaves a reversion in the conveyor. *Fidelity & Columbia Trust Co.* v. *Williams*, 268 Ky. 671, 105 S.W. 2d 814 (1937).

Whether, in the event of termination of the trust by the daughters, the trust assets will revert to decedent's estate or pass as a remainder is crucial to respondent's case. If respondent's argument that the decedent has a reversion whether or not the daughters terminate the trust is correct, the act of termination by the daughters would not affect the ultimate disposition of the trust assets, but merely accelerate the date of distribution of those assets.

It is well settled in Kentucky that whether an interest passes as a remainder or a reversion depends upon the intention of the grantor. This intention is to be ascertained from within the four corners of the instrument of conveyance, reading every part and clause of the paper in connection with other parts and giving effect to all parts if possible. *Department of Revenue* v. *Kentucky Trust Company*, 313 S.W. 2d 401 (Ky. 1958). However, at common law, and until recently in Kentucky, the doctrine of reversions on which the respondent relies operated as a strict rule of law voiding the attempted remainder in the heirs of the grantor. *Thurman* v. *Hudson*, 280 S.W. 2d 507 (Ky. 1955); Simes and Smith, Future Interests, sec. 1601 (2d ed. 1956). The doctrine is not now a rule of law in Kentucky but a "rule of construction in seeking the intention of the grantor from the language used." *Thurman* v. *Hudson, supra* at 508. Hence, the intention of the grantor can overcome the application of the doctrine of reversions. This Court must thus look to the trust agreement to ascertain the intent of the decedent.

One factor that the courts have relied upon as evidence of the intent of the grantor to create a remainder in his heirs is that the grantor has reserved a power to appoint the purported remainder interest by will alone. The reasoning is that such a testamentary power of appointment would be unnecessary if the grantor intended a reversion since the grantor during his life or in his will could convey a reversion. Further, it cannot be argued that the testamentary power is merely an expression of the legal right to convey a reversion since the power cannot be exercised in an inter vivos instrument. *Richardson* v. *Richardson*, 298 N.Y. 135, 81 N.E. 2d 54 (1948); *National Shawmut Bank* v. *Joy*, 315 Mass. 457, 53 N.E. 2d 113 (1944). However, in *Fidelity & Columbia Trust Co., supra*, a testamentary power of appointment in

---

[4] This doctrine is more commonly known as the "doctrine of worthier title." However, Kentucky considers the doctrine of reversions to apply to inter vivos transfers and the doctrine of worthier title to apply to transfers by will. See *Mitchell* v. *Dauphin Deposit Trust Co.*, 283 Ky. 532, 142 S.W. 2d 181 (1940).

the grantor was present but did not prevent the application of the doctrine of reversions. The settlor had made an inter vivos transfer in trust, the income to go to the settlor for her life and then to the settlor's stepson until he reached the age of 21 years, at which time he would receive the corpus. But if the stepson should predecease the settlor, the corpus at the death of the settlor would pass in accordance with her will, or if the settlor should die without a will, to her heirs at law. The Kentucky court applied the doctrine of reversions but did not consider the effect of the settlor's testamentary power, apparently because at that time the doctrine was regarded as a rule of law in Kentucky, rendering the settlor's intent irrelevant.

We are therefore confronted with a factor that has been deemed indicative of the grantor's intent to create a reversion or a remainder by some courts, and yet the Kentucky courts have never considered this factor. Fortunately, there is an additional factor that has been even more persuasive and on which a Kentucky court has passed. Illustration 1 to comment on subsection (1) of section 314 of the Restatement, Property, states:

A, owning Blackacre in fee simple absolute, makes an otherwise effective inter vivos conveyance thereof "to B for life then to the heirs of A determined as of the death of B." The rule stated in this section [the doctrine of worthier title] does not apply because the limitation is not to the heirs of the conveyor at his death.[5]

It appears that Kentucky approves of the view expressed by the Restatement. In *Department of Revenue* v. *Kentucky Trust Company, supra,* the decedent created an inter vivos trust, the income of the trust to go to decedent's wife for her life, then to decedent's two daughters for their lives, with cross remainder in the event of no lineal descendants, otherwise to such descendants. If both daughters should die without lineal descendants, the trust agreement provided that "said trust shall be distributed to Trustor's heirs at law in accordance with the laws of descent and distribution then in existence under the laws of Kentucky." The trust agreement also provided that "Trustor reserves no right or interest in the income or principal of the trust estate unto himself." During his life, the decedent was advised that he might have a reversion in the trust. The decedent then wrote a letter to the trustee stating that it had not been his intention to retain any interest in the trust and that if he did have a reversionary interest, it should be paid over to a local church. The State of Kentucky attempted to tax the value of the trust corpus on the theory that decedent had a reversionary interest in the trust. The Court of Appeals of Kentucky found, however, that decedent had not retained a reversion, but had intended the interest to go to his heirs at law as a remainder.

---

[5] See also Simes and Smith, Future Interests, sec. 1606 (2d ed. 1956), and cases cited therein.

The court stated that the trust agreement created a class of remainder-men, not of decedent's heirs at law at the time of his death, but of those who would have been decedent's heirs at law had decedent died simultaneously with the death of the last of his daughters. The court stated that the trust agreement and also decedent's letter to the trustee plainly showed that decedent intended to part with all interest in the trust fund and, therefore, the doctrine of reversions, being a rule of construction and not of law, would not be decisive.

We cannot, of course, be sure what the court in *Kentucky Trust Company* would have done had the only indication of the decedent's intent been the direction to determine the decedent's heirs as of a time other than his death. From a reading of the court's opinion, however, we believe that the court would have considered this indication the deciding factor. In its decision, the court considered the time that the decedent's "heirs" were to be determined and stated:

This clause creates a class of remaindermen as though Trustor had died intestate simultaneously with the death of the last beneficiary who might die during Trustor's lifetime. This clause certainly does not create a reversionary interest in the trust estate. [p. 403]

The court then proceeded to discuss the additional indicia of the decedent's intent, but this quotation seems to indicate that the court believed a direction to determine "heirs" at any time other than the grantor's death overcomes the force of the doctrine of reversions in construing the grantor's intent.

Having thus arrived at a determination of the applicable Kentucky law, we must now proceed to apply that law to the present case. Article III of the trust agreement provides that if the daughters of decedent terminate the trust, the trust assets, since the decedent expressly refrained in his will from exercising his power of appointment, will go to decedent's heirs at law "in the proportions in which they may be entitled to inherit from him, according to the laws of the State of Kentucky then in force." Petitioner argues that "then in force" refers to the date of termination of the trust by the daughters. That is, the trust assets would go to those who would be decedent's heirs at law were decedent to die at the time the trust is terminated. Petitioner further argues that since the daughters cannot terminate the trust for 6 years after decedent's death, the class of takers of the trust assets could conceivably be different from the heirs at law of decedent. Hence, in accord with *Kentucky Trust Company, supra*, decedent clearly intended the trust assets to pass as a remainder and not to revert to his estate.

We are impressed with the similarity of the language in this case with the language of the trust agreement construed by the Kentucky court in *Kentucky Trust Company*. We also think that the reasoning

of the court in *Mitchell* v. *Dauphin Deposit Trust Co.*, 283 Ky. 532, 142 S.W. 2d 181 (1940), is helpful. There, the court construed a will containing this provision: "If my daughter shall die without children or descendants then the estate herein devised for her use and benefit shall go to my heirs at law as the same would descend from me." Among the reasons the court gave in support of its decision that the heirs of the grantor were to be determined as of the death of the daughter and hence take a remainder was the following:

If he [the draftsman of the will] had used only the words "heirs at law" there would be more room for doubt but these words were followed by the words "as the same would descend from me". These latter words had a meaning. If he referred to heirs at law at the time of the testator's death, they were useless and meaningless. We think the addition of those words indicates that he was referring to a class who would be his heirs at a point of time (the date of his daughter's death) beyond his own death. [p. 543]

This reasoning applies equally to the present case. If decedent had intended a reversion, the words "in the proportions in which they may be entitled to inherit from him, according to the laws of the State of Kentucky then in force" would be superfluous. These words do not appear to be mere verbiage; rather, they appear to be carefully selected.

Our construction of the words "then in force" is supported by decisions in other States. A California court in *Bixby* v. *Hotchkis*, 58 Cal. App. 2d 445, 136 P. 2d 597 (1943), construed almost identical language in the same manner. In that case, a grantor had created an inter vivos trust for a period of 20 years, at the end of which the trust estate would revert to the grantor. The trust instrument provided that "In the event that I [the grantor] should die prior to the expiration of said period the whole thereof to my heirs at law in accordance with the laws of succession of the State of California then in effect." The court had little trouble in deciding that the grantor's heirs at law were not to be determined as of the grantor's death and therefore that the heirs were to take as contingent remaindermen. A Missouri court in *Norman* v. *Horton*, 344 Mo. 290, 126 S.W. 2d 187 (1939), reached a similar result on the basis of the following language in a will:

but should the * * * [life tenant] die without Bodily Heirs, as aforesaid, surviving her, then the title to the above described Real Estate, at her death, shall revert to and vest absolutely in the Heirs-at-law of the said * * * [grantor] * * *

We therefore find that the decedent, in the event of termination of the trust by his daughters, and in the event decedent should not exercise his testamentary power of appointment, intended the trust assets to pass as a remainder to those who would be decedent's heirs at law should decedent die at the time of the termination of the trust by the daughters. Under Kentucky law, decedent at the date of his death

had no interest in this contingent remainder,[6] and no part of the remainder is thus includable in decedent's gross estate under section 2033.

Both parties agree that the decedent's power of appointment over the trust assets in the event of termination of the trust by the daughters is not an interest in property within the meaning of section 2033 since the power terminates at the decedent's death. See, *Helvering* v. *Safe Deposit Co.*, 316 U.S. 56 (1942) ; *Estate of Gertrude Leon Royce*, 46 B.T.A. 1090 (1942), acq. 1944 C.B. 24.

In summary, the only interest of the decedent in the trust property within the meaning of section 2033 is the reversionary interest that the decedent has should the trust not be terminated by the daughters but remain in existence until the death of the last survivor of the six measuring lives named in the trust agreement. The value of this reversion, to the extent it can be ascertained, is includable in decedent's gross estate.

Respondent also places reliance on section 2037, which provided, in part, at the date of decedent's death, that:

SEC. 2037. TRANSFERS TAKING EFFECT AT DEATH.

(a) GENERAL RULE.—The value of the gross estate shall include the value of all property * * * to the extent of any interest therein of which the decedent has at any time after September 7, 1916, made a transfer * * * by trust or otherwise, if—

(1) possession or enjoyment of the property can, through ownership of such interest, be obtained only by surviving the decedent, and

(2) the decedent has retained a reversionary interest in the property (but in the case of a transfer made before October 8, 1949, only if such reversionary interest arose by the express terms of the instrument of transfer), and the value of such reversionary interest immediately before the death of the decedent exceeds 5 percent of the value of such property.[7]

Section 2037(b) defines "reversionary interest" to include a possibility that property transferred by the decedent "(1) may return to him or his estate, or (2) may be subject to a power of disposition by him."

The parties agree, and we so find, that possession or enjoyment of the property can only be obtained by surviving the decedent. One of the measuring lives of the trust is the decedent, and the power of decedent's daughters to terminate the trust is contingent upon their surviving him by 6 years.

Since decedent created the trust in question in 1929, the value of the trust is not includable in his estate unless the reversionary interest of the decedent was created by the express terms of the trust agreement. Petitioner argues that the reversionary interest of the decedent that arises from his failure to provide in the trust agreement for the dispo-

---

[6] As a matter of property law, this interest might more properly be termed a "shifting executory interest." See Restatement, Property, sec. 25, comment e.

[7] Sec. 2037 was amended in 1962, but the change is not pertinent.

sition of the trust assets, if the trust should continue until the death of the last survivor of the named measuring lives, arises by operation of law, and not by the express terms of the trust agreement. Respondent argues that the omission from the trust agreement of any dispositive provisions, in the event of termination at the death of the last measuring life, results in a reversion arising by the express terms of the trust instrument.

Respondent's argument, if adopted, would logically lead to the conclusion that all reversionary interests that arise because of the failure of the trust instrument to deal with all possible contingencies arise "by the express terms of the instrument of transfer." This result is certainly contrary to the ordinary, generally accepted meaning of the word "express." See *Commissioner* v. *Marshall's Estate*, 203 F. 2d 534 (C.A. 3, 1953), affirming 16 T.C. 918 (1951), nonacq. 1952–1 C.B. 6; *Richardson* v. *The United States*, 190 F. Supp. 369 (Wyo. 1961). It is also contrary to respondent's own regulations. Section 20.2037–1(f)(1), Estate Tax Regs., gives an example of a reversionary interest considered to arise by operation of law and not by the express terms of the instrument:

Sec. 20.2037–1 Transfers taking effect at death.

\*     \*     \*     \*     \*     \*     \*

(f) *Transfers made before October 8, 1949.* (1) \* \* \* For example, assume that the decedent, on January 1, 1947, transferred property in trust with the income payable to his wife for the decedent's life and, at his death, remainder to his then surviving descendants. Since no provision was made for the contingency that no descendants of the decedent might survive him, a reversion to the decedent's estate existed by operation of law·

We therefore find that the reversionary interest of the decedent that arises because of the omission from the trust agreement of any dispositive provisions in the event of termination of the trust at the end of the last of the measuring lives is a reversionary interest that arises by operation of law.

We have already determined, in discussing the application of section 2033, that in the event of termination of the trust by the decedent's daughters, the gift to the heirs of the decedent did not result in a reversionary interest in the decedent. However, section 2037(b) also defines a reversionary interest to include a possibility that property transferred by the decedent "may be subject to a power of disposition by him."

Article III of the trust agreement provides that if the daughters terminate the trust, "the trust estate shall be liquidated and distributed according to the provisions of the last will and testament" of decedent, or in the absence of such provisions, then among decedent's heirs at law. This provision clearly subjects the trust property to a power of disposition by the decedent, but the effect of an exercise of the

power is contingent upon termination of the trust by decedent's daughters. Petitioner argues that a power subject to such a contingency cannot be classified as a reversionary interest and cites as authority for this position the case of *Commissioner* v. *Singer's Estate*, 161 F. 2d 15 (C.A. 2, 1947), affirming a Memorandum Opinion of this Court, which involved a remote contingent power of appointment by deed among members of a restricted class.

*Singer's Estate* was decided before the enactment of the Technical Changes Act of 1949, 63 Stat. 891, which added the requirement that a reversionary interest must exceed in value 5 percent of the value of the transferred property in order to result in the application of section 2037. Before the addition of the "5-percent" rule, but after the decision in *Singer's Estate*, the Supreme Court decided that any reversionary interest, no matter how remote, retained by a decedent would result in the entire transferred property being included in decedent's gross estate. *Estate of Spiegel* v. *Commissioner*, 335 U.S. 701 (1949), affirming 159 F. 2d 257 (C.A. 7, 1946), reversing a Memorandum Opinion of this Court.

The authority of *Singer's Estate* is questionable today in view of *Estate of Spiegel*, and more clearly, in view of the addition of the 5-percent rule by the Technical Changes Act of 1949. *Estate of Spiegel* and the addition of the 5-percent rule have changed the focus from a consideration of whether decedent has retained a reversionary interest or power of disposition sufficient to warrant inclusion of the entire trust property in decedent's gross estate to a consideration of whether decedent has any reversionary interest or power of disposition whose value exceeds 5 percent of the value of the property transferred. See, for example, *Costin* v. *Cripe*, 235 F. 2d 162 (C.A. 7, 1956). In other words, if *Singer's Estate* were being decided today, a court would clearly find a power of disposition in the decedent. The only question would be its value. Accordingly, we find that the testamentary power of disposition held by decedent in the present case is a reversionary interest within the meaning of section 2037(b). For the purposes of section 2037, the fact that decedent expressly declined to exercise the power is irrelevant.

However, decedent's power of disposition in this case cannot be valued by the use of any recognized valuation principles. Decedent's power to dispose of the trust assets immediately before his death was contingent upon survival of the decedent and his wife for 6 years by the decedent's daughters, and the voluntary act of those daughters, or the survivor of them, of terminating the trust. Any prediction of the daughters taking action to terminate the trust would be a mere guess. If the daughters would not terminate the trust, the trust assets upon the death of the six-named measuring lives (which includes the

daughters) would revert by operation of law to decedent's estate—very possibly to the issue of the daughters. But assuming decedent exercised his power in favor of the daughters, the daughters would very probably be willing to terminate the trust and receive the trust assets for their own use. On the other hand, if we assume that decedent exercised his power over the trust assets to pass them outside the family, the daughters would be very reluctant to terminate the trust—leaving decedent's power with little or no value.

Accordingly, we find that since the decedent's power of disposition over the trust assets cannot be ascertained by the use of any recognized valuation principles, the power must be accorded a value of zero. *In re Cardeza's Estate*, 261 F. 2d 423 (C.A. 3, 1958); *Slade's Estate* v. *Commissioner*, 190 F. 2d 689 (C.A. 2, 1951), reversing 15 T.C. 752 (1950). No part of the trust assets can thus be included in decedent's gross estate under section 2037.

. Respondent further relies upon section 2038(a)(2) which provides, in part, in the case of transfers on or before June 22, 1936, that the value of the gross estate shall include the value of all property:

To the extent of any interest therein of which the decedent has at any time made a transfer * * * by trust or otherwise, where the enjoyment thereof was subject at the date of his death to any change through the exercise of a power, either by the decedent alone or in conjunction with any person, to alter, amend, or revoke, or where the decedent relinquished any such power in contemplation of his death.

Respondent argues that decedent retained certain powers, amounting to a power to alter, amend, or revoke, under the trust agreement at the time of the creation of the trust in 1929. Respondent notes that under the trust agreement the cotrustees had the power to invest, sell, reinvest, and otherwise deal with the endowment. The individual trustee could use the income from the trust estate at his discretion or apply the income to the endowment. He could also receive income from the endowment and sell the personalty, using the proceeds in his discretion. The trustees jointly could reduce the endowment, but not below a value of $100,000; they could receive and hold property; and after the trust had been in effect for 15 years, they could sell land from the farm.

However, the trust agreement was reformed by court judgment in 1952, and the Graham farm was sold under authorization by the Kentucky court. The proper inquiry must thus be into the powers of the decedent as of the date of his death.

At the date of his death, decedent clearly had, as individual trustee, only the right to be consulted before the corporate trustee could take certain actions. The income of the trust was to be paid by the corporate trustee, "after advising with the individual trustee," to Mary Graham Fritts and Martha Graham Gerstle, in approximately equal

proportions as the household or living expenses of themselves and their families indicated to be in the best interest of the family as a whole. If in the judgment of the corporate trustee, "after advising with the individual trustee," any part of the income was not needed by the beneficiaries, it could be retained and invested and distributed at a later time when the needs of the family required. If the power to pay or accumulate income is a power to alter, amend, or revoke, the question then becomes whether the right of the individual trustee to be consulted in this instance amounts to a power in the individual trustee to alter, amend, or revoke.

We are convinced that the right of the individual trustee to be consulted is not a power to alter, amend, or revoke. The individual trustee can take no action on his own initiative, or cause any action to be taken, nor can he prevent the corporate trustee from taking any action. All that the individual trustee can do is to offer his advice. The corporate trustee is still required to exercise its independent judgment. In *Estate of Clayton William Sherman*, 9 T.C. 594 (1947), the Tax Court considered a slightly stronger but similar power to the one now in question. The decedent had created an inter vivos trust with income payable to his wife for life. The trustees had the power to invade the corpus of the trust for the benefit of the wife if, in their judgment, the income of the trust was insufficient to support her. However, no part of the corpus could be invaded during the lifetime of the decedent "without his written consent thereto." In considering the applicability of section 811(d)(2) of the Internal Revenue Code of 1939 [now sec. 2038], the Court stated that:

The decedent reserved no power in himself to alter, amend or revoke this trust, and the power of the trustees to use the trust corpus for the support of the decedent's wife, if that ever became necessary, taken in conjunction with the provision that they could not exercise that power during his life without his written consent, does not come within the quoted provision of the statute. [pp. 597–598]

The Court then pointed out that corpus could not have been invaded unless it had been necessary to do so for the support of the wife and held that no part of the trust property was properly included in the gross estate. We therefore have little difficulty in deciding that the right of the decedent to be consulted is not a power to alter, amend, or revoke.

As mentioned earlier, the trust instrument was reformed by court judgment in 1952. From a comparison of the court judgment with the trust agreement, it appears to be possible that the judgment did not extinguish all of the powers of the trustees granted in the trust agreement. Certainly, the powers of the individual trustee in regard to the Graham Farm were extinguished

with the sale of that farm. At the date of decedent's death, all of the trust assets were in the form of personalty. The trust agreement had originally divided the trust assets into two categories: (1) Real estate and accompanying tangible personal property and (2) corporate stock ("the endowment"). With the sale of the real estate and accompanying tangible personal property, the trust assets consisted of corporate stock and similar investment assets. It could thus be argued that the endowment was still in existence at the decedent's death. Therefore, the provision of the trust agreement giving the corporate trustee and the individual trustee the power, acting jointly, to "invest, sell, reinvest, and otherwise deal in and with the endowment" would still be in effect at the date of decedent's death.

Even assuming that the decedent had the power, acting jointly with the corporate trustee, at the date of his death to invest, sell, reinvest, and otherwise deal in and with the endowment, we believe that this power would not constitute a power to alter, amend, or revoke. The Tax Court has considered three cases where the decedent had retained the power to direct the trustee to sell, exchange, invest, or reinvest any of the trust property without liability to the trustee for any resulting loss. *Estate of Willard V. King*, 37 T.C. 973 (1962), nonacq. 1963–1 C.B. 5; *Estate of George W. Hall*, 6 T.C. 933 (1946), acq. 1946–2 C.B. 3; *Estate of Henry S. Downe*, 2 T.C. 967 (1943), nonacq. 1944 C.B. 37. In these cases, we decided that such a power in the decedent did not constitute a power to alter, amend, or revoke since a trustee must act in good faith in accordance with his fiduciary responsibility and, accordingly, must act to safeguard and conserve the trust property.[8]

We have yet to consider, under section 2038, decedent's testamentary power of appointment or "power of disposition." As the statutory language of section 2038 reads "subject at the date of his death to any change through the exercise of a power," it is irrelevant that decedent expressly declined to exercise his power. *William H. Korn, et al., Executors*, 35 B.T.A. 1071 (1937); *Fidelity-Philadelphia Trust Co., Trustee*, 34 B.T.A. 614 (1936).

Decedent's power of disposition was contingent upon his daughters surviving him by 6 years, and upon their voluntary act of terminating the trust. While section 2038(b) provides that the power to alter, amend, or revoke shall be considered to exist on the date of decedent's death even though the alteration, amendment, or revocation takes effect only on the expiration of a stated period after the exercise of the power, section 20.2038–1(b), Estate Tax Regs., provides that "section 2038 is not applicable to a power the exercise of which was subject to a contingency beyond the decedent's control which did not occur before his death."

[8] Cf. *State Street Trust Company v. United States*, 263 F. 2d 635 (C.A. 1, 1959), where the area of the trustees' discretion in dealing with the trust assets was "about as broad as language can make it and the law permits."

Respondent does not argue that decedent's power of disposition should result in the inclusion of any trust property in the gross estate under section 2038(a)(2). Petitioner, however, argues that decedent's power of disposition was, in accord with section 20.2038–1(b), Estate Tax Regs., "subject to a contingency beyond the decedent's control which did not occur before his death." Petitioner cites two cases in support of his position: *Jennings* v. *Smith*, 161 F. 2d 74 (C.A. 2, 1947); and *Estate of Cyrus C. Yawkey*, 12 T.C. 1164 (1949), acq. 1949–2 C.B. 3.

In *Jennings*, the trustees (one of whom was the decedent) were directed to accumulate the income of the trust and to add the accumulated income at the end of each year to corpus. However, the trustees could distribute any part of the income to the beneficiary *if* the trustees should first determine that the distribution would be necessary to maintain the beneficiary and his family "in comfort and in accordance with the station in life to which he belongs." The trustees were also authorized to invade corpus for the benefit of the beneficiary *if* the beneficiary or his issue "should suffer prolonged illness or be overtaken by financial misfortune which the trustees deem extraordinary." The court held that the trust property was not subject to a power to alter, amend, or revoke at the date of decedent's death since neither of the contingencies that would allow the trustees to distribute income or invade corpus had in fact occurred before decedent's death.

In *Estate of Cyrus C. Yawkey*, the trustees (one of whom was the decedent) could distribute the corpus of the trust (three identical trusts were involved) to the income beneficiary of the trust after the income beneficiary attained the age of 30. None of the income beneficiaries of the three trusts had attained age 30 at the date of decedent's death. The Court stated that decedent's power did not exist at the date of his death since the operative contingency had not occurred.

But the present case can be distinguished from the above cases. In the present case, no contingency must occur before decedent's power can be exercised. Decedent's power is absolute—he had absolute power at the date of his death to affect the interests of those who would be his heirs at law at the time of, and contingent upon, the termination of the trust by the daughters. Decedent therefore had a present power to alter, amend, or revoke a contingent remainder.

Decedent's power is somewhat similar to the power of the decedent in *Estate of Samuel Want*, 29 T.C. 1223 (1958), reversed in part on other grounds 280 F. 2d 777 (C.A. 2, 1960). In that case, the decedent had established a trust for the benefit of his daughter, the corpus to be paid to her when she attained age 30. If the daughter died before the age of 30, leaving no surviving children, the income of the trust was to be paid one-half to decedent's widow and one-half to decedent's three sisters. Upon the death of the widow, the trust would terminate,

and the trust assets would be distributed to a list of about 15 beneficiaries. Decedent reserved the right to change this list of beneficiaries "at any time so long as he may live." Decedent was also empowered to name a substitute trustee in the event of the death of one of the designated trustees.

In referring to the latter power, the Court stated "This was a contingent power, the condition for the existence of which (as distinguished from its exercise) was not fulfilled during decedent's life." The Court cited, among others, *Estate of Cyrus C. Yawkey, supra,* and *Jennings v. Smith, supra.* The Court said of the power to change the list of beneficiaries:

> However, it does seem apparent that decedent retained a present power during his life of changing those beneficiaries whose rights were contingent upon the death of * * * [the daughter] without issue prior to her 30th birthday and the death of decedents wife. This power is a power to alter or amend within the meaning of section 811(d). * * * [the predecessor of sec. 2038. p. 1242]

Since in the present case, decedent has a power to alter, amend, or revoke only the contingent remainder interest, only that interest is included in decedent's gross estate under section 2038(a)(2). *Estate of Samuel Want, supra;* Estate of *Albert E. Nettleton,* 4 T.C. 987 (1945), acq. 1946-1 C.B. 3. We have already determined that the value of such interest cannot be ascertained by the use of any recognized valuation principles and must therefore be accorded a value of zero.

We conclude that no part of the trust property should included in decedent's gross estate under sections 2037 and 2038, and under section 2033, only the value of decedent's reversionary interest in the trust property upon termination of the trust at the death of the last of the six-named measuring lives is includable in decedent's gross estate. We find that this reversionary interest has a maximum ascertainable value of $1,488.58.

Since our decision does not result in any deficiency in estate tax,

*Decision will be entered for the petitioner.*