ESTATE OF ANDERS JORDAHL, DECEASED, UNITED STATES TRUST COMPANY OF NEW YORK, AND WENDELL W. FORBES, CO-EXECUTORS, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 5651-73.    Filed October 15, 1975.

*Robert D. Whoriskey* and *Alfred Grotell,* for the petitioners.
*Marion L. Westen,* for the respondent.

OPINION

TIETJENS, *Judge:* The Commissioner determined a deficiency of $310,891.80 in the Federal estate tax of Anders Jordahl (hereafter decedent).

The issue for decision is whether any of the assets, including the proceeds of insurance policies on decedent's life, held in a trust established by decedent are includable in decedent's gross

estate under section 2038 or section 2042.[1]

This case was fully stipulated pursuant to Rule 122, Tax Court Rules of Practice and Procedure. The facts which we deem necessary for decision will be referred to below.

Petitioners are the executors under the will of decedent, who died a resident of Franklin Township, Somerset County, N. J. On the date of filing of the petition in this case, the legal residence of petitioner Wendell W. Forbes was Somerset, N. J. On that date, petitioner United States Trust Co. of New York maintained its principal address and place of business in New York, N. Y.

By agreement dated January 8, 1931, decedent, as donor, created a trust. The trust agreement designated decedent, Mary Dyas Jordahl (decedent's wife), and Guaranty Trust Co. of New York (now doing business as Morgan Guaranty Trust Co. of New York and hereafter referred to as Guaranty) as original trustees. Mary Dyas Jordahl died on June 25, 1967, and no successor trustee was appointed in her place. The first article of the agreement provided as follows:

FIRST: During the lifetime of the Donor, the Trustees shall pay the premiums which may become due and payable on the policies or any of them from the income of the trust or from cash seasonably furnished from time to time for that particular purpose by the Donor. In order to afford the Donor an opportunity to furnish cash seasonably for the payment of premiums should the income of the trust be insufficient for that purpose, the Trustees, if, in their opinion they will or may not have on hand sufficient income to pay a premium about to fall due, shall give to the Donor notice in writing to that effect; to effect the continued payment of the premiums on the policies, the Trustees are authorized in their discretion to retain in their hands an undistributed balance of cash income in such amount as may seem to them necessary. Should the income of the trust be insufficient or should the Donor fail to furnish cash seasonably to pay the premiums of all the policies, then the Trustees at their sole and unrestricted option and for the purpose of obtaining funds with which to pay premiums on any policy, may sell, at public or private sale, without notice to the Donor or to any other person, property and securities other than the policies constituting the principal of the trust, may borrow upon the policies or any of them or as the assignee of any policy, may exercise options for the automatic application of loan provisions to the payment of future premiums, it being understood that said methods of obtaining funds are permissible only and not mandatory upon the Trustees and the Donor hereby expressly releases the Trustees from all liability for failure to avail themselves of said methods or any of them and from the consequences of such failure. The Trustees are authorized

---

[1] All statutory references are to the Internal Revenue Code of 1954, unless otherwise stated.

in their sole discretion to select from time to time the policies for the payment of premiums on which money actually available shall be applied in the event that premiums of all the policies may not be provided for. Unless the income of the trust or unless cash seasonably furnished by the Donor shall be sufficient to enable the Trustees to pay such premiums, the Trustees shall be under no obligation to pay them nor to see that payment is made by the Donor or otherwise and the Trustees shall be under no liability to anyone in case such premiums are not paid nor for any result of the failure to make such payments. The Trustees shall be responsible for the proceeds of the policies only when, as and if collected by or paid to them and the Trustees shall not be liable to any one if for any reason whatsoever the policies or any of them shall lapse or be otherwise uncollectible unless such lapse or uncollectibility results from the negligence of the Trustees in failure to pay premiums out of the income of the trust actually in hand or out of cash actually in hand and seasonably furnished for that particular purpose by the Donor. In the event that after the payment of premiums on the policies and the retention of the balance of income in suitable amount there shall be a further balance of income remaining, the Trustees shall distribute such balance remaining to the Donor.

The second article vested the trustees with all right, title, and interest in the policies and authorized them to "exercise and enjoy all options, rights and privileges therein and beneficial interests thereunder as fully and effectually as the Donor might have done." Decedent reserved any disability benefits under the policies. There were no provisions for disability benefits under the life insurance policies owned by the trust.

The fourth article of the trust provided, in part:

FOURTH: The Trustees shall receive and hold the proceeds of the policies as well as the proceeds of any other policies which may hereafter be made subject to the terms hereof upon the uses and trusts and for the purposes herein set forth * * *

Under the sixth article of the agreement, "Upon the death of the Donor, the Trustees * * * [were to] hold, manage, invest and reinvest the proceeds of any insurance policies which come into their hands and the securities and other property constituting the trust fund" to pay income to Helen Jordahl Prescott until she should have attained the age of 50, at which time the trustees were to "transfer, assign and pay over the principal of said trust" to her. If she were to die before she reached 50, the remainder was to go to her issue or, if none, to the donor's residuary estate or heirs.

The ninth article provided:

NINTH: The Donor hereby expressly reserves the privilege of depositing with or making payable to the Trustees under this agreement additional

policies of insurance on Donor's life and of substituting other policies of equal value for those at any time on deposit with the Trustees hereunder, and such additional or substituted policies shall be subject in all respects to the terms of this agreement.

The Donor further expressly reserves the privileges of depositing with the Trustees under this agreement any additional securities or property and the right to substitute other securities or property for those at any time on deposit with the Trustees hereunder, provided that the securities or property so substituted shall be of equal value to the securities and/or property so replaced and such additional securities and/or property shall be subject in all respects to the terms of this agreement.

Other relevant articles provided as follows:

NINETEENTH: The trust hereby created shall be deemed to be a New York trust and shall in all respects be governed by the laws of the State of New York.

TWENTY-SECOND: The Donor hereby declares this trust to be irrevocable.

Pursuant to the agreement, decedent transferred to the trust securities which had an aggregate inventory value of $82,353.75 and four life insurance policies on decedent's life. The four policies consisted of the following:

Northwestern Mutual Life Insurance Company, Policy No. 2117951, for $50,000, issued on November 5, 1928, maturing at death, annual premium $2,420.50.

Northwestern Mutual Life Insurance Company, Policy No. 2117952, for $50,000, issued on November 5, 1928, maturing at death, annual premium $2,420.50.

Equitable Life Assurance Society of the United States, Policy No. 1596861, for $5,000, 20-year payment issued on May 10, 1909, fully paid up.

Northwestern Mutual Life Insurance Company, Policy No. 1394342, for $5000, 20-year endowment issued on February 4, 1920, maturing February 4, 1940, annual premium $266.45.

The terms of the policies held in trust on the date of decedent's death provided that the owner had the right to change beneficiaries, to determine the application of dividends, to assign the policies, to borrow against them, to elect certain options on surrender or lapse, and to determine and change the manner in which proceeds were to be paid.

During decedent's lifetime no additional policies were deposited with the trustees nor were any substitutions of policies made. On February 28, 1940, the trustees surrendered the 20-year endowment policy, issued by Northwestern Mutual, which had matured on February 4, 1940.

Income from property owned by the trust was far in excess of the premiums payable plus other administrative expenses. Distributions of excess income were made to decedent in each year of the trust's existence except for 1933 through 1936 and aggregated $214,891.51. The value of the property owned by the trust was $691,099.08 including the proceeds of the insurance policies as of decedent's date of death.

The Commissioner determined that all of the trust assets, including the proceeds of the insurance policies, were includable in decedent's gross estate. He argues that section 2038(a)(2) requires the inclusion in decedent's gross estate of all of the assets held by the trust at decedent's death. He also argues that, under section 2042(2), at least the proceeds of the policies are includable in decedent's gross estate.

The Commissioner apparently rests his determination that all of the trust assets are includable in decedent's gross estate on decedent's power, under the ninth article of the trust agreement, to substitute securities, property, and policies for those transferred to the trust in the first place. The Commissioner argues that decedent could have exchanged property with the trust so as to "alter, amend, or revoke" the trust within the meaning of section 2038(a)(2).

We do not believe that decedent's power to substitute property was a power to "alter, amend, or revoke" the trust. The trust agreement specifically provided that any property substituted should be "of equal value" to property replaced. Decedent was thereby prohibited from depleting the trust corpus. Compare: *Commonwealth Trust Co. of Pittsburgh v. Driscoll,* 50 F. Supp. 949 (W.D. Pa. 1943), affd. per curiam 137 F.2d 653 (3d Cir. 1943), cert. denied 321 U.S. 764 (1944); and *Chandler v. Commissioner,* 119 F.2d 623 (3d Cir. 1941), affg. 41 B.T.A. 165 (1940). See *Fifth Ave. Bank of New York v. Nunan,* 59 F. Supp. 753, 757 (E.D. N.Y. 1945).

This Court and others have considered cases involving settlors who have retained the power to direct trustees as to investments, and, where settlors have been bound to act in good faith and in accordance with fiduciary standards, the retained powers over investment have not been treated as powers to alter, amend, or revoke. *Estate of Ralph Budd,* 49 T.C. 468, 476 (1968); *Estate of James H. Graham,* 46 T.C. 415, 429 (1966); *Estate of Willard V. King,* 37 T.C. 973, 981 (1962); *Estate of Henry S. Downe,* 2 T.C.

967 (1943); *Estate of George W. Hall,* 6 T.C. 933 (1946); *United States v. Powell,* 307 F.2d 821 (10th Cir. 1962); *Fifth Ave. Bank of New York v. Nunan, supra.* See also *United States v. Byrum,* 408 U.S. 125 (1972).

Decedent's power to substitute property "of equal value" would modify or alter the trust no more than those powers to direct investments involved in the cases cited above. Moreover, like the settlors involved in those cases, decedent was bound by fiduciary standards. Even if decedent were not a trustee, he would have been accountable to the succeeding income beneficiary and remaindermen, in equity, especially since the requirement of "equal value" indicates that the power was held in trust. *Carrier v. Carrier,* 226 N.Y. 114, 123 N.E. 135 (1919); *Application of Esty,* 75 N.Y.S. 2d 905 (N.Y. County Sup. Ct. 1947); *Heyman v. Heyman,* 33 N.Y.S. 2d 235 (N.Y. County Sup. Ct. 1942); *Osborn v. Bankers Trust Co.,* 168 Misc. 392, 5 N.Y.S. 2d 211 (N.Y. County Sup. Ct. 1938); *Stix v. Commissioner,* 152 F.2d 562, 563 (2d Cir. 1945), affg. 4 T.C. 1140 (1945); 1 Restatement of Trusts 2d, sec. 185.

The Commissioner argues that decedent could, through substitution, institute investment in highly productive property to deprive the remaindermen of benefits or, similarly, in unproductive property to deprive an income beneficiary of property. We do not believe that decedent could have used his power to shift benefits in such a manner. Substitutions resulting in shifted benefits would not be substitutions of property "of equal value." In *Estate of Willard v. King, supra* at 980, we considered New York law and an argument similar to that proposed by the Commissioner:

Under these circumstances we think that although the decedent, under his broad discretionary powers with respect to investment, might invest in properties producing either a high or a low return of income, such powers would have to be exercised in good faith in accordance with his fiduciary responsibility and could not be used for the purpose of attempting to favor any beneficiary or class of beneficiaries to the detriment of the other beneficiaries.[2]

---

[2] It is true that decedent was the income beneficiary of the trust during his life, but we note that Helen Jordahl Prescott was also a potential income beneficiary and that, under certain conditions, her issue would be entitled to income and not principal until they were 21. We therefore assume that decedent's fiduciary obligation not to reduce the income of the trust would have been enforced. However, even if decedent could have invested without limitation in less productive assets, we should not consider such a power subject to sec. 2038. Any investment in less productive assets and decedent's waiver of his income rights should be construed as a transfer by decedent of a portion of his income interest to the

The Commissioner also contends that, when, on occasion, decedent waived his right to income and commissions, both of which, the Commissioner argues, were required to be paid, decedent altered or amended the trust.[3] We do not believe that the 20th article required the trustees to accept commissions, for it states merely that the trustees are "entitled" to commissions. In any event, we believe that any waiver of commissions or right to income may be treated as the deposit of additional property authorized by the ninth article of the agreement. Since decedent was authorized to add property to the trust, his leaving cash in the trust may not be seen as a violation of the agreement or an amendment "in fact." [4]

The Commissioner's review of the trust's history serves no meaningful function. We are not convinced on this record that decedent and Guaranty engaged in any improper investments that may be construed as de facto amendment of the trust. And we find no evidence that decedent's dealings with the trust involved substitutions for less than equal value.

Under the first article of the agreement, the trustees, including decedent, were given power to sell and pledge property and policies and were released from liability for failure to do so in the event that the trust income and payments by decedent were insufficient to pay policy premiums. We need not consider whether decedent might have utilized that power and release from liability to alter effectively the trust, for income was never insufficient to pay premiums and, accordingly, decedent never

succeeding income beneficiaries and remaindermen. In other words, at most, decedent reserved a power to alienate a portion of his income interest.

[3] We do not understand the Commissioner to argue that the power to augment the trust is a power to alter or amend the trust and we see no reason to so hold. See 3 Mertens, Law of Federal Gift and Estate Taxation, sec. 25.14, p. 647 (1959). Even where a trustee is not explicitly authorized to receive additional property from a settlor, according to at least one commentator, he may receive such property. 1 Scott, Trusts 406 (3d ed.). See Uniform Trustees' Powers Act, sec. 3(c)(2). See also *In Re Rausch's Will,* 258 N.Y. 327, 179 N.E. 755 (1932); *Wells Fargo Bank & Union Trust Co. v. Superior Court,* 32 Cal. 2d 1, 193 P.2d 721 (1948). Decedent's fiduciary obligations would have prohibited him from using such a power to shift interests in property already in the trusts. *Carlton's Estate v. Commissioner,* 298 F.2d 415, 417-418 (2d Cir. 1962), revg. 34 T.C. 988 (1960), which is factually distinguishable from the instant case but discusses those fiduciary restrictions which, under New York law, would limit decedent's power.

[4] Although the Commissioner and petitioners apparently agree that sec. 2036(b) prohibits the inclusion of all of the assets of the trust under sec. 2036(a), we note that later additions to the trust may be subject to sec. 2036(a). See, for example, *Estate of James L. Thomson,* 58 T.C. 880 (1972), affd. 495 F.2d 246 (2d Cir. 1974).

held the discretionary power. Sec. 20.2038-1(b), Estate Tax Regs.; *Estate of Ralph Budd,* 49 T.C. 468, 474 (1968); *Estate of Frederick M. Kasch,* 30 T.C. 102 (1958); *Daisy Christine Patterson, Executrix,* 36 B.T.A. 407 (1937). See also *Estate of Lena R. Arents,* 34 T.C. 274, 281 (1960), revd. on another issue 297 F.2d 894 (2d Cir. 1962), cert. denied 369 U.S. 848 (1962).

Nevertheless, the Commissioner asserts that, even if the securities and other property in the trust are not includable in decedent's gross estate, the proceeds of the three insurance policies are includable under section 2042(2). We have examined those powers and rights decedent had with respect to the policies and conclude that, at his death, he did not possess any "incidents of ownership" within the meaning of that section.

As trustee, decedent received dividends on the policies, and, as beneficiary, decedent was entitled to those dividends not used as income to pay premiums. However, it is well established that, since dividends "are nothing more than a reduction in the amount of premiums paid," the right to dividends is not an incident of ownership. *Estate of Chester H. Bowers,* 23 T.C. 911, 917 (1955). See also *Estate of Newcomb Carlton,* 34 T.C. 988, 996 (1960), revd. on another issue 298 F.2d 415 (2d Cir. 1962); *Estate of Louis J. Dorson,* 4 T.C. 463 (1944); *D. W. Blacksher et al., Executors,* 38 B.T.A. 998, 1005 (1938).

As trustee, decedent's powers over the policies were strictly limited under the first article of the agreement.[5] In the event that income was not available and cash was not furnished by decedent, the trustees, "at their sole and unrestricted option," were authorized to sell property other than the policies and to "borrow upon the policies or any of them or as the assignee of any policy, * * * [to] exercise options for the automatic application of loan provisions to the payment of future premiums." If the income of the trust and cash furnished by the decedent were limited, the trustees could select which policies to maintain. Such use of the policies was not mandatory, and, unless the income of the trust or the cash furnished by the decedent was sufficient, the trustees were under no obligation to pay premiums.

---

[5] The broad powers contained in the policies themselves and transferred under the second article of the agreement are, we believe, limited by the terms of the agreement. See the concurring opinion in *Carlton's Estate v. Commissioner,* 298 F.2d at 420. See also *Estate of Bert L. Fuchs,* 47 T.C. 199 (1966); *Estate of Sidney F. Bartlett,* 54 T.C. 1590, 1597-1598 (1970).

We do not see how decedent's power under that first article may be termed an incident of ownership. Income from the trust was never insufficient to pay premiums on the policies, and, accordingly, decedent never "possessed" the power to exchange the cash surrender value of the policy for other property in which he would have had an income interest. Compare *Estate of Myron Selznick,* 15 T.C. 716 (1950), affd. per curiam 195 F.2d 735 (9th Cir. 1952). The possibility that income might have been insufficient, a possibility which decedent, as a fiduciary, could not effectuate, seems too remote to be considered an incident of ownership which decedent possessed. See *Estate of Newcomb Carlton,* 34 T.C. at 998. See also *Estate of Walter Dawson,* 57 T.C. 837, 841 (1972), affd., without published opinion 480 F.2d 917 (3d Cir. 1973).[6]

As we construe the trust agreement, decedent, as trustee, had no other power with regard to the insurance policies. Under the fourth article, the trustees were required to "receive and hold the proceeds of the policies," and, under the sixth, the trustees were required to "hold, manage, invest and reinvest the proceeds of any insurance policies which come into their hands" along with the other property of the trust. We are not convinced that, under these directions, the trustees could exercise options as to the payment of proceeds, especially in light of the requirement of the sixth article, section 1, that, when Helen Jordahl Prescott shall have attained the age of 50 years, the trustees must "pay over the principal of said trust to * * * [her], absolutely and forever."

As we construe the agreement, decedent, as trustee, retained none of the incidents of ownership mentioned by the Commissioner in his briefs or his Estate Tax Regulations, sections 20.2042-1(a)(2) and 20.2042-1(c)(4): decedent could not assign the policies, and he had no power to change the beneficial ownership or beneficiaries or to determine the manner of payment of proceeds. He could have borrowed on the policies or elected options on surrender or lapse only if income was insufficient to pay premiums, but income was, in fact, always sufficient.

Finally, the Commissioner argues that decedent's reservation of "the privilege of * * * substituting other policies of equal value

[6] We do not consider whether such a possibility should be treated as a reversionary interest under sec. 2042(2), for neither party has raised the question or given us guidance in determining the value of such possibility.

for those at any time on deposit with the trustees" allowed decedent to reacquire full ownership of the policies in the trust. We cannot imagine, and the Commissioner does not suggest, a way in which decedent could have reacquired a policy in the trust without substituting an almost identical policy, for the requirement of equal value would seem to demand equal cash surrender and face value, comparable premiums, and a similar form of policy. Decedent's power to reacquire was, in effect, a power to exchange at arm's length. Decedent could not have deprived any beneficiary of an interest or have increased his own share in the trust or in the policies. Decedent may have had the power to reacquire specific policies, but he did not, until reacquisition, possess incidents of ownership in them, for any reacquisition would have required the surrender of nearly identical policies and of nearly identical incidents. To recover any of the benefits of the policies, decedent would have had to surrender comparable benefits. Certainly such power, in effect to purchase the policies, cannot be considered an "incident of ownership." And certainly the possession of such a right to substitute cannot be seen as a right to the "economic benefits of the policy." Sec. 20.2042-1(c)(2), Estate Tax Regs. See also *Estate of Hector R. Skifter,* 56 T.C. 1190, 1197 (1971), affd. 468 F.2d 699 (2d Cir. 1972). Any substitution of policies would have had no substantive effect on the respective rights of decedent and the other beneficiaries in the trust and its assets. Accordingly, we hold that decedent's power to substitute policies "of equal value" cannot be considered an incident of ownership.

*Decision will be entered under Rule 155.*