ESTATE OF EDWARD E. FORD, DECEASED, MANUFACTURERS HANOVER TRUST COMPANY, EXECUTOR, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3925–67.   Filed October 30, 1969.

*Alan J. Hruska* and *Richard M. Scharfman,* for the petitioner.
*Paul H. Frankel* and *Powell W. Holly, Jr.,* for the respondent.

STERRETT, *Judge:* The Commissioner determined a deficiency of $1,510,444.90 in the estate tax liability of the Estate of Edward E. Ford, deceased. After allowance of a credit for State death taxes "if substantiated" of $556,309.22, the Commissioner asserts a net deficiency of $954,135.68.[1]

Due to certain concessions, the issues remaining for our decision are as follows:

---

[1] On June 30, 1967, the petitioner made an advance payment of the net deficiency ($954,135.68) to the Internal Revenue Service.

(1) Whether decedent's transfer of certain State and municipal bonds to his daughter within 3 years of his death was "in contemplation of his death" within the meaning of section 2035 of the Internal Revenue Code of 1954.[2]

(2) Whether decedent retained either the "right * * * to designate the persons who shall possess or enjoy the property or the income" of a trust he created for the benefit of his grandson under the provisions of section 2036(a)(2), or the power "to alter, amend, revoke or terminate" such trust pursuant to the terms of section 2038(a)(1).

FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. The pertinent facts are set forth below.

Manufacturers Hanover Trust Co. (hereinafter referred to as petitioner) is the duly appointed executor of the Estate of Edward E. Ford, deceased. At the time of filing its petition herein, petitioner had its principal place of business in New York, N.Y. Edward E. Ford (hereinafter referred to as the decedent) died on March 6, 1963. The Federal estate tax return for the Estate of Edward E. Ford was filed with the district director of internal revenue at New York, N.Y.

Decedent's father, A. Ward Ford, was a founder of the predecessor of International Business Machines Corp. (hereinafter referred to as IBM). From 1917 to 1936, decedent worked for IBM and its predecessor. He was associated with various other businesses between the years 1936 and 1949. In 1949, decedent was elected a director of IBM and thereafter became a member of IBM's Executive and Finance Committee and its Executive Compensation Committee, which positions he held until his death.

In 1918, decedent married Jane Bloomer (hereinafter sometimes referred to as Jane). Decedent's only child, Julia, was born during this marriage. Julia was married in 1947, and had one son, Edward Ford Donaldson (hereinafter referred to as Edward) by her first husband. She was divorced in 1949, and in 1953 married Lyman W. Menard (hereinafter sometimes referred to as Lyman). Julia had three sons (David, Andrew, and William) by her second husband.

### Issue 1. Transfer in Contemplation of Death

Decedent's wife, Jane, died on November 9, 1960. Her will provided for the creation of a "Marital Trust" out of one-half of her adjusted gross estate. On March 22, 1961, decedent exercised his unrestricted right to invade the principal of this trust by withdrawing State and

---

[2] Unless designated otherwise, all future statutory references herein will be to the Internal Revenue Code of 1954.

municipal bonds having an appropriate value of $818,000. He immediately transferred these bonds outright, without consideration, to his daughter, Julia. This gift of March 22, 1961, is the subject of the instant controversy. On May 30, 1961, Julia, at the suggestion of her father, transferred the bonds and the IBM stock she owned to the Hanover Bank to be held in trust.

On March 22, 1961, decedent owned 40,472 shares of IBM stock having a market value of approximately $28,500,000. In addition, decedent was the income beneficiary of two trusts with combined corpora worth almost $15 million. The gift in issue (valued at approximately $818,000) constituted less than 3 percent of decedent's holdings of IBM stock alone.

Under the provisions of a trust created by her grandfather, A. Ward Ford, Julia would receive at the death of her father one-quarter of the principal of such trust, having a value on the date of the gift of approximately $14,350,000. In addition, upon the death of a childless aunt, Julia would receive an additional one-twelfth of the principal (having an approximate value of $4,800,000) of the A. Ward Ford Trust.

Decedent's will of May 13, 1958, which was in effect on the date of the disputed transfer, made no provision for his daughter with the exception of a bequest of his home and personal property. On July 18, 1961, decedent executed a new will bequeathing his home and personal effects to his prospective second wife, Jane McCurdy. The Edward E. Ford Foundation was the primary beneficiary under all wills and codicils executed by decedent during the years involved herein. Decedent stated to his second wife, lawyer, financial consultant, and accountant that he made no significant provision in his will for his daughter because she would receive more money than she would want or need from the A. Ward Ford Trust.

Prior to the transfer at issue of March 22, 1961, decedent and his wife transferred gifts of IBM stock to various trusts created for the benefit of their daughter and four grandsons as follows:

| | Date of gift | Grantor | Beneficiary | Trust corpus (Number shares of IBM stock) | Value |
|---|---|---|---|---|---|
| 1. | 5/16/46 | Jane | Julia | Originally 150 | $35,550 |
| 2. | 5/16/46 | Decedent | Julia | Originally 150 | 35,550 |
| 3. | 9/29/53 | Decedent | Julia | Originally 100 | 22,800 |
| | 7/1/54 | Decedent | Julia | Added 20 | 5,945 |
| | 6/27/55 | Decedent | Julia | Added 14 | 5,943 |
| 4. | 12/14/53 | Decedent | Edward | Originally 20 | 4,930 |
| | 6/27/55 | Decedent | Edward | Added 14 | 5,943 |
| 5. | 11/25/57 | Decedent | Edward | Originally 20 | 6,055 |
| | 12/1/58 | Decedent | Edward | Originally 13 | 5,863 |
| | 4/6/60 | Decedent | Edward | Originally 11 | 5,639 |
| 6. | 11/25/57 | Decedent | Andrew | Originally 20 | 6,055 |
| | 12/1/58 | Decedent | Andrew | Added 13 | 5,863 |
| | 10/3/60 | Decedent | Andrew | Added 11 | 5,639 |
| 7. | 11/25/57 | Decedent | David | Originally 20 | 6,055 |
| | 12/1/58 | Decedent | David | Added 13 | 5,863 |
| | 10/3/60 | Decedent | David | Added 11 | 5,639 |
| 8. | 10/3/60 | Decedent | William | Originally 11 | 5,639 |

Additionally, decedent gave Julia and her husband outright at various times before the transfer, 13 shares each of IBM stock totaling $11,726 in value, an automobile, a heating and air-conditioning system for their home, and a 24-foot cabin cruiser. However, the Menards sold the cabin cruiser and purchased a smaller craft. They attempted to return to the decedent the difference between the sales proceeds of the cruiser and the new boat. The decedent refused to accept the amount proffered.

In March 1961, in part as a result of distributions of principal from the two trusts of May 16, 1946, Julia owned IBM stock and municipal bonds having approximate market values of $1,300,000 and $175,000, respectively. In addition, at that time her interest in the trust created September 29, 1953, was worth approximately $307,000. The income produced from Julia's holdings was relatively small (e.g., during 1960 dividend income on the IBM stock was $5,925 and the interest income on municipal and other nontaxable bonds equaled $7,158.76). Prior to the gift in controversy, Lyman and Julia's combined gross income from all sources was never higher than the 1960 figure of $23,458.

The Menards lived on a rather modest scale. They lived in a $20,000 home, sent their children to public schools, seldom traveled, and managed to save about $200 a month. Decedent and Jane indicated to Julia and others their strong desire that she and Lyman buy a larger house, employ servants, send the children to private school, travel, and generally live on a higher scale. Julia resisted her parents' suggestions insisting that it was better for the children that they live within the income of herself and her husband. She declined her parents' offer of large gifts, except those made on special occasions.[3]

Decedent felt a moral obligation to transfer the State and municipal bonds in question to Julia because it had been his wife's wish that Julia own this property some day. He also desired that Julia acquire some experience in managing money to prepare her for the vast wealth she would someday receive from the A. Ward Ford Trust.

During 1962, the first full year after the gift, the Menards' interest income from State and municipal bonds increased from the 1960 level of $7,158.76 to $39,327.50, and their after-tax income of $58,628.74 was more than 2½ times the 1960 figure of $22,663.85. Subsequent to the gift, the Menards redecorated their home and eventually built a new one.

In December 1950, more than 10 years before the gift in controversy, decedent was hospitalized for 10 days for observation following com-

---

[3] The previously mentioned trusts dated May 16, 1946, and Sept. 29, 1953, were created on the occasion of Julia's first and second marriages respectively. The 26 shares of IBM stock transferred by decedent to Julia and Lyman (13 shares each) were for Christmas 1958.

118

plaints of pain in both forearms. An electrocardiogram was taken which "was apparently abnormal but did not show a coronary." Decedent was asymptomatic during his hospital stay. Although a positive diagnosis was not made, it was believed that decedent had suffered "arteriosclerotic heart disease with anginal syndrome and probable impending coronary occlusion." Following his hospitalization in 1950, decedent's electrocardiogram was normal.

On one occasion in 1955 decedent had paroxysmal auricular tachycardia, a rapid heartbeat, for about 2 hours. This was readily controlled with quinidine. In November 1956, decedent experienced some precordial distress (discomfort over the heart region). When decedent visited his physician for a routine checkup on July 8, 1957, he reported no chest pains.

Between November 1956 and the date of the transfer, decedent experienced no serious illness. At a routine physical examination on September 30, 1959, decedent informed his physician that he occasionally had a feeling of pressure in his lower chest, which was not accompanied by pain or related to exertion. At that time, decedent's physician discerned a grade 2 diastolic heart murmur. He observed no symptoms referable to this murmur, and advised decedent that he had no cause for concern since people with similar murmurs live for years. On October 14, 1960, his last routine checkup before the gift, decedent's physician informed him that he was in good physical condition and could lead a normal life. While he felt that decedent had some degree of arteriosclerotic heart condition, he saw no reason to inform decedent of that fact since this condition was common in men over 60, and decedent's symptoms were mild and insignificant.

On March 30, 1962, decedent had an attack of chest pain lasting 8 to 10 hours. On May 3, 1962, he visited his doctor due to chest pains of the same type he had experienced for several years, but of a more severe nature. Also in May 1962, decedent experienced a gallbladder attack and experienced rapid heartbeat for which his doctor prescribed digitalis. After an examination on January 21, 1963, decedent's physician noted that the decedent looked well and had been in excellent health for the past 6 months.

The decedent was an active and energetic person right up to the date of his death. At the time of making the gift in issue, he was actively courting Mrs. Jane McCurdy Jamison, a widow whom he met at a friend's cocktail party on February 16, 1961. In fact, he had dinner with Mrs. Jamison 5 consecutive nights through the date of the gift in question. Decedent became engaged to Mrs. Jamison in April 1961 and married her on July 22, 1961. Decedent planned and made all the arrangements for a European honeymoon, and he and his bride trav-

eled for nearly 2 months by automobile throughout Italy, Switzerland, Germany, France, and England.

After returning from his honeymoon in September 1961, decedent concerned himself with numerous activities. As an IBM director and committee member, decedent was interested in IBM affairs and attended 77 of the 99 IBM annual, board, and committee meetings held during the years 1960 through 1962. In addition, decedent actively pursued his interest in secondary education through the Edward E. Ford Foundation, a charitable institution he created in 1957 to benefit secondary schools. On April 12, 1961, decedent contributed $7 million worth of IBM stock to the foundation and subsequently concerned himself with such foundation affairs as the hiring of employees, renting space, and selecting recipients for the foundation's grants. Also included among the activities engaged in by decedent after his remarriage were the following: Inspecting and supervising the design and construction of a $250,000 home in Delray Beach, Fla., directing the redecoration of a $65,000 New York apartment, and playing golf three to five times per week.

On various occasions both before and after the gift here involved, decedent received tax and estate-planning advice from Robert M. Lovell, senior vice president of Manufacturers Hanover Trust Co., Dan Kramer, member of the New York accounting firm of Oppenheim, Appel, Dixon & Co., and Frank H. Detweiler, a senior partner in the New York law firm of Cravath, Swaine & Moore. At the time of the disputed transfer, decedent was aware of the fact that an inter vivos gift to his daughter would reduce his estate tax liability.

Decedent never expressed any concern for his health to his wife, lawyer, financial consultant, or doctors. Indeed, decedent impressed these individuals as being an optimistic, jovial, enthusiastic, and vigorous person who thoroughly enjoyed life.

On March 6, 1963, decedent died unexpectedly at the age of 69. The evening before he had gone swimming in his pool, and before retiring for the night, he experienced a rapid heartbeat. However, he rejected his wife's suggestion that he call his physician. The death certificate stated the cause of decedent's death to be coronary thrombosis due to an arteriosclerotic coronary artery.

Decedent treated the transfer of March 22, 1961, as a gift on his Federal gift tax return for 1961, and paid a gift tax on said transfer in the amount of $196,410.12.[4] In his statutory notice dated May 19, 1967, respondent determined that the State and municipal bonds, having a fair market value as of the date of death of $859,270.58,

---

[4] The computation of tax on the statement attached to the statutory notice allows a gift tax credit of $196,410.12 for the gift tax paid by decedent on the transfer here involved. The parties have stipulated that if petitioner is successful on the contemplation-of-death issue this gift tax credit is not to be allowed on a Rule 50 computation.

transferred by decedent to his daughter were includable in decedent's gross estate under the provisions of section 2035.

*Issue 2. Trust Powers Reserved by the Grantor-Trustee*

By "Declaration of Trust" dated December 14, 1953, the decedent created an irrevocable trust having an original corpus of 20 shares of IBM stock. Decedent subsequently transferred an additional 14 shares of IBM stock to the trust.

Under the terms of the trust, decedent's grandson, Edward, was to receive "not less frequently than quarter-annually" the entire net income of the trust until he attains age 25. At such time, the entire trust estate is to be distributed to Edward free from trust. If Edward should die before reaching age 25, the trust property is to be paid at his death to his surviving child or children; or if no child survives him, to his mother, Julia; however, if neither any child nor his mother survives him, then the trust corpus shall pass to those persons who would be his heirs-at-law had he died intestate.

Decedent named himself sole trustee of the trust. Petitioner's predecessor, the Hanover Bank, Manhattan, New York, was designated as successor trustee in the event of decedent's death or his inability to continue to act as trustee, without having resigned and appointed a successor.

The declaration of trust provides in pertinent part as follows:

FIRST: The Trustee is authorized to retain as assets of the trust estate during any part or all of the period of the trust, any property at any time received in trust hereunder, including, but not limited to, shares of capital stock of the International Business Machines Corporation, without liability for loss in so doing, and in so doing the Trustee need not consider nor shall he be subject to any duty to dispose of such property in order to diversify the assets of this trust estate; to sell, lease, exchange, transfer or convey any property held hereunder for such consideration and upon such terms as he may deem reasonable; to invest and reinvest all or any part of the principal of the trust estate in such class or classes of property as the Trustee may in his discretion determine and select, including, but not limited to, shares or participations in any common fund, and in the exercise of such discretion the Trustees shall not be limited to investments of such nature as are now or may at the time be legally authorized for the investment of trust funds; to determine wheher any money or property coming into his hands shall be considered part of the principal of the trust estate or part of the income thereof; to apportion between principal and income of the trust estate any loss or expenditure in connection with the trust estate, which in his opinion should be apportioned, and in such manner as he may deem advantageous and equitable; * * *

THIRD: * * * If at any time or from time to time it shall appear to the satisfaction of the Trustee that the said EDWARD FORD DONALDSON shall be in need of funds in excess of the income which may then be available for his

benefit from the trust estate and from any other source or sources of which the Trustee has knowledge, for the purpose of defraying expenses occasioned by illness, infirmity or disability, either mental or physical, or for his support, maintenance, education, welfare and happiness, then the Trustee may relieve or contribute toward the relief of any such need by paying to him or using and applying for his benefit such sum or sums out of the principal of the trust estate as the Trustee deems to be reasonable and proper under the circumstances. The Trustee, in considering at any time whether or not to make any disbursements of principal under the terms hereof, shall consider primarily the welfare of the said EDWARD FORD DONALDSON, and shall not unduly conserve the principal for later distribution to him or to others having contingent remainder interests. * * *

FOURTH: Grantor's daughter, JULIA FORD MENARD, shall have the right at any time during the life of EDWARD FORD DONALDSON and before he attains the age of twenty-five (25) years to terminate the trust herein created, by filing with the Trustee an instrument in writing declaring such termination, and thereupon there shall be paid over and distributed to EDWARD FORD DONALDSON, or if he shall then be a minor, to said JULIA FORD MENARD, as his natural guardian, or to the legally appointed guardian or curator of his property, in either case for the use of EDWARD FORD DONALDSON, all of the property then constituting the trust estate, free from trust.

SEVENTH: The trust estate hereby created shall be irrevocable by the Grantor and the Grantor shall have no control over the same of any kind or character whatsoever or any reversion or any possibility of reverter in or to the trust estate, it being the intention of the Grantor by the execution and delivery of this indenture to divest himself completely and irrevocably of all interests of every kind or character whatsoever in and to the property herewith given in trust and in and to the property which may hereafter be added by him or any other person to the trust estate.

TWELFTH: The validity of the terms and provisions of this instrument shall be governed by the laws of the State of Missouri, the domicile of of [sic] the Grantor, but inasmuch as the trust may be held and administered by the Successor Trustee in the State of New York, all questions with respect to the administration of the trust estate shall be governed by the laws of the State of New York.

Decedent reported his original contribution of 20 shares of IBM stock and his subsequent contribution of 14 shares of IBM stock as gifts on Federal gift tax returns filed by him for the calendar years 1953 and 1955 respectively. The respondent determined that the entire trust assets, having a fair market value as of the date of death of $142,528.88, were includable in the decedent's gross estate under the provisions of sections 2036 and 2038.

OPINION

*Issue 1. Transfer in Contemplation of Death*

Respondent advances the position that the decedent's transfer of March 22, 1961, was in contemplation of death within the intent of

section 2035,[5] thereby requiring the inclusion of the value of the State and municipal bonds in his gross estate. The Supreme Court, in discussing a similar issue arising under a progenitor (sec. 402(c), I.R.C. 1918) of section 2035, interpreted the phrase "in contemplation of death" to mean "that the thought of death is the impelling cause of the transfer." *United States* v. *Wells*, 283 U.S. 102, 118 (1931). An exhaustive review of the record herein convinces us that decedent's dominant motives in making the transfer were associated with life and that the thought of death was not an impelling motive for the transfer.

The determination of the dominant motive of the decedent-donor turns upon the peculiar facts and circumstances of each individual case. *Allen* v. *Trust Co.*, 326 U.S. 630, 636 (1946). We are unaware of any case on all fours with the instant one, and it would not appear to serve any useful purpose to discuss here the plethora of cases that consider the question. Instead, we shall set forth the salient factors which compel our conclusion.

First, the transfer in issue does not smack of being a substitute for a testamentary disposition. Four credible witnesses in whom the decedent regularly confided (his second wife, lawyer, financial consultant, and accountant) testified that he had no intention of leaving any property to his daughter, Julia. This was not due to any lack of affection on his part, but because, under the provisions of a trust created by her grandfather, Julia was destined to receive more money than she could ever possibly need or want (i.e., approximately $14,350,-000 at decedent's death and an additional $4,800,000 upon the death of an aunt).

This testimony is supported by the testamentary documents here in evidence. Under decedent's will in effect at the time of the gift, the only provision in favor of his daughter was a bequest of his home and his personal property. Shortly before his remarriage, decedent executed a new will bequeathing this property to his second wife. The primary beneficiary of decedent's property under all of decedent's wills and codicils throughout the period in issue was the Edward E. Ford Foundation.

---

[5] SEC. 2035. TRANSACTIONS IN CONTEMPLATION OF DEATH.

(a) GENERAL RULE.—The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, in contemplation of his death.

(b) APPLICATION OF GENERAL RULE.—If the decedent within a period of 3 years ending with the date of his death (except in case of a bona fide sale for an adequate and full consideration in money or money's worth) transferred an interest in property, relinquished a power, or exercised or released a general power of appointment, such transfer, relinquishment, exercise, or release shall, unless shown to the contrary, be deemed to have been made in contemplation of death within the meaning of this section and sections 2038 and 2041 (relating to revocable transfers and powers of appointment) ; but no such transfer, relinquishment, exercise, or release made before such 3-year period shall be treated as having been made in contemplation of death.

Moreover, the size of the gift in controversy is insubstantial (less than 3 percent of decedent's holdings of IBM stock alone) in relation to the immense wealth of the donor-decedent. Additionally, decedent and his first wife had a history of making gifts to their daughter and grandchildren over a 15-year period prior to the transfer here involved. While these earlier gifts were certainly small in comparison to the disputed transfer, it is clear from the record that the gifts to Julia would have been larger and more frequent if she had not resisted her parents efforts to increase her standard of living

Secondly, the impelling purposes for decedent's transfer were associated with life, rather than death. Again, decedent's daughter, second wife, lawyer, financial consultant, and accountant presented credible testimony to the effect that Julia's parents desired her to live in a more comfortable fashion, but that she declined their generous offers and insisted on living within her husband's modest means. Under this testimony, it is evident that decedent withdrew the tax-exempt bonds from the "Marital Trust" with the dominant purpose of enhancing his daughter's standard of living during his lifetime. It can reasonably be inferred from the record before us that decedent knew his daughter would be unlikely, soon after her mother's death, to decline property that had once been owned by her mother.

Other secondary purposes entertained by decedent were what he viewed as a moral obligation to effectuate Jane's wish that Julia own the bonds some day, and a desire that Julia acquire some experience in managing money. However, we have not accorded much weight to the latter motive since the bonds were placed in trust shortly after the transfer, and Julia managed only the interest income arising therefrom as it was distributed to her.

Thirdly, decedent's relatively good physical condition and optimistic and energetic disposition indicate that he neither harbored, nor had any reason to harbor, any thought of an impending death. Decedent's hospitalization in 1950, more than 10 years prior to the gift in issue, marked the only time during the period here involved wherein his normal activities were interrupted due to symptoms relating to his heart. While decedent on infrequent occasions experienced tachycardia and precordial distress, these symptoms were controllable and of short duration, and were not viewed with any concern by his doctors. Additionally, one of decedent's physicians detected a grade 2 diastolic murmur and some degree of an arteriosclerotic heart condition, but he attached no particular significance thereto since these mild symptoms were not uncommon in men over 60. Throughout the period directly in issue, decedent's doctors advised him that he was in good health and could lead a normal life.

124

Decedent's enthusiasm for life manifested itself in his numerous activities and projects. During the years immediately prior to and after the disputed transfer, decedent was engaged in the following activities: Attended 77 of 99 IBM annual, board, and committee meetings; courted and married Mrs. Jamison; traveled extensively by automobile on a European honeymoon; pursued his interest in secondary education through contributions of IBM stock and personal effort to the Edward E. Ford Foundation; personally supervised the construction of a $250,000 Florida home and the redecoration of a $65,000 New York apartment; and played golf 3 to 5 times per week.

Decedent impressed his wife, lawyer, financial consultant, and doctors as being optimistic, jovial, enthusiastic, and vigorous. At no time did he express any concern regarding his health to these individuals. Indeed, he was so unconcerned with respect to his health that he quickly rejected his second wife's suggestion that he call his doctor when he experienced a rapid heartbeat the night before his death.

Finally, respondent would have us draw inferences adverse to petitioner's case from the fact that decedent regularly sought tax and estate-planning advice. We decline to do so. The record is barren of any evidence that the nature and purpose of this advice was other than that which would ordinarily be sought by a prudent man of ample means seeking to plan intelligently his financial affairs. As the Supreme Court observed in considering a case arising under a precursor (sec. 302(c), I.R.C. 1926) of section 2035, "thoughtful men habitually act with regard to ultimate death, but something more than this is required to show that a conveyance comes within the ambit of the statute." *Colorado Bank* v. *Commissioner*, 305 U.S. 23, 27 (1938).

From the testimony given by petitioner's witnesses before this Court, there emerged the picture of a man who thoroughly enjoyed life and entertained absolutely no morbid fears during all times relevant hereto. Based upon this credible testimony, the entire record, and the foregoing considerations, we find that the transfer here involved was *not* made in contemplation of death within the intent of section 2035.

### Issue 2. Trust Powers Reserved to the Grantor-Trustee

Respondent argues that the powers reserved to the trustee under the instant trust instrument are so broad as to require the inclusion of the principal of the trust in the decedent's gross estate pursuant to the provisions of sections 2036(a)(2)[6] and/or 2038(a)(1).[7] Petitioner

---

[6] SEC. 2036. TRANSFERS WITH RETAINED LIFE ESTATE.

(a) GENERAL RULE.—The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer * * * by trust or otherwise, under which he has retained for his life

contends that the reserved powers are limited by judicially enforceable external standards sufficient to place the trust property beyond the reach of these inclusionary provisions. We agree with the petitioner.

Paragraph Seven of the trust instrument provides that the transfer shall be "irrevocable" by the grantor, and it is clear from a reading of the trust instrument that the grantor did not expressly reserve either "the right * * * to designate the persons who shall possess or enjoy the property or income therefrom" or the power to "alter, amend, revoke, or terminate" the trust. It is, of course, true that the foregoing statutory provisions will operate to sweep the trust property into the grantor's gross estate if he in fact retained sufficient control to be able to shift, in whole or in part, the economic benefits of the trust from one beneficiary to another. *Commissioner* v. *Estate of Holmes*, 326 U.S. 480, 487, and 489 (1946); and *Estate of Milton J. Budlong*, 7 T.C. 756, 763 (1946), affirmed on this point sub nom. *Industrial Trust Co.* v. *Commissioner*, 165 F.2d 142, 146 (C.A. 1, 1947). Thus our task is to scrutinize and interpret the trust indenture in order to determine whether the grantor-trustee herein reserved the right to manipulate these verboten strings.

## a. Invasion Power

Under the terms of the trust instrument, the grantor-trustee has the power to invade corpus for Edward's benefit "for the purpose of defraying expenses occasioned by illness, infirmity or disability, either mental or physical, or for his support, maintenance, education, welfare and happiness." In support of his position that the trustee herein was given unusually broad discretionary power over the trust property, respondent stresses the trustee's power as enumerated above to invade corpus for the "happiness" of the income beneficiary. Undoubtedly, the word "happiness" standing alone, or in conjunction with language exhorting the trustee to administer the trust liberally for the benefit of one beneficiary over another, does not provide an ascertainable standard enforceable in a court of equity. Cf. *Merchants Bank* v. *Com-*

---

or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death—

&ast;   &ast;   &ast;   &ast;   &ast;   &ast;   &ast;

 (2) the right, either alone or in conjunction with any person, to designate the persons who shall possess or enjoy the property or the income therefrom.

7 SEC. 2038. REVOCABLE TRANSFERS.

 (a) IN GENERAL.—The value of the gross estate shall include the value of all property—

  (1) TRANSFERS AFTER JUNE 22, 1936.—To the extent of any interest therein of which the decedent has at any time made a transfer * * * by trust or otherwise, where the enjoyment thereof was subject at the date of his death to any change through the exercise of a power * * * by the decedent alone or by the decedent in conjunction with any other person * * * to alter, amend, revoke, or terminate, or where any such power is relinquished in contemplation of decedent's death.

126

*missioner*, 320 U.S. 256, 261–263 (1943). But that is not the case here.[8]

However, the respondent would have us ignore the fact that the foregoing language is circumscribed by the precondition that, when the trustee is satisfied that the income beneficiary is "in *need* of funds in excess of the income which may then be available," then he may invade principal to "relieve or contribute toward the relief of *any such need*." (Emphasis added.) Thus, the instrument in question places a fiduciary responsibility on the trustee to determine "need" before he may invade principal for any of the prescribed reasons, i.e., for the "illness, infirmity, or disability, either mental or physical" or for the "support, maintenance, education, welfare and happiness" of the income beneficiary. In its usual sense, the term "need" is synonymous with "necessity" or "exigency," and denotes an "urgency" or a "pressing lack of something essential." *Webster's New Collegiate Dictionary* (7th ed. 1965), based on *Webster's New International Dictionary* (3d ed. 1961). There is no indication that the word "need," as used in the trust instrument, was intended to carry any other than its customary meaning.

By virtue of the presence of the term "happiness" in the trust instrument, respondent would have us conclude that the grantor-trustee herein had unbridled discretion to invade corpus upon the whim of the income beneficiary. To the contrary, we do not accord this single word such as talismanic effect. A word, such as "happiness," must be construed in the context in which it appears "because its meaning may be affected by the words it accompanies." *Estate of Marvin L. Pardee*, 49 T.C. 140, 144 (1967). Viewing the invasion provision in its entirety, we conclude that its emphasis on "need" delimits "happiness" as well as the other enumerated terms, and provides an external, objective standard enforceable against the grantor-trustee in a court of equity. *United States* v. *Powell*, 307 F.2d 821, 826–828 (C.A. 10, 1962). It is well settled that where the trust instrument contains such a standard, the grantor-trustee is not deemed to have retained sufficient dispositive discretion to activate the operative provisions of either section 2036 or section 2038. *Jennings* v. *Smith*, 161 F.2d 74, 77–78 (C.A. 2, 1947). *Estate of C. Dudley Wilson*, 13 T.C. 869, 872–873 (1949), affirmed per curiam 187 F.2d 145 (C.A. 3, 1951) ; and *Delancey* v. *United States*, 264 F. Supp. 904, 907 (W.D. Ark. 1967).

Moreover, an examination of the applicable State law [9] reveals that

---

[8] The invasion provision in issue does contain a clause advising the trustee that he should "consider primarily the *welfare*" of the income beneficiary, and not "*unduly* conserve the principal for later distribution to him or others having contingent remainder interests." (Emphasis supplied.) However, this language is not nearly so sweeping as that involved in the *Merchants Bank* case cited above.

[9] The 12th provision of the trust indenture provides that "questions with respect to the administration of the trust estate shall be governed by the laws of the State of New York."

an aggrieved beneficiary [10] could indeed enforce his rights against an imprudent or wrongdoing trustee. There is an abundance of New York authority stating that a trustee owes a duty of equal loyalty to all beneficiaries. See for example: *Matter of Dickson's Estate*, 38 Misc. 2d 678, 237 N.Y.S. 2d 572) (N.Y. Co. Surr. Ct. 1963) ; *Matter of Heinrich's Will*, 195 Misc. 803, N.Y.S. 2d 875 (Monroe Co. Surr. Ct. 1949) ; and *Matter of James' Estate*, 86 N.Y.S. 2d 78, 89 (N.Y. Co. Surr. Ct. 1948). The language of the Court of Appeals of New York in *Matter of Hubbell's Will*, 302 N.Y. 246, 254, 97 N.E. 2d 888, 891 (1951), reflects the position taken by the New York courts on this question:

In judging the conduct of trustees, the basic consideration is the fiduciary obligation which they owe to all of the beneficiaries whom they represent. * * * "A trustee", this court said in Meinhard v. Salmon, * * * "is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the 'disintegrating erosion' of particular exceptions * * *." [Citations omitted.]

Finally, as we said in *Estate of Lillie MacMunn Stewart*, 52 T.C. 830 (1969), in discussing a similar issue arising under section 2055, "The thrust of New York law is further reflected in a statutory provision declaring void any provision exonerating a fiduciary 'from liability for failure to exercise reasonable care, diligence, and prudence.' " N.Y. Est., Powers & Trust Law, sec. 11–1.7 (a) (1) (McKinney 1967). It is patent from the foregoing authority that should the grantor-trustee overstep the boundaries of his discretion to favor one beneficiary over another, the New York courts would compel his "obedience to the great principles of equity which are the life of every trust." *Carrier* v. *Carrier*, 226 N.Y. 114, 123 N.E. 135, 138 (1919).

Thus, although we deem the question to be a close one, we conclude that the grantor-trustee herein did *not* have untrammeled discretion to invade corpus at his own whim or that of the income beneficiary. Consequently, the presence of the invasion power in the trust indenture does not in our view operate to trigger the provisions of sections 2036 (a) (2) and/or 2038 (a) (1).

### b. *The Administrative and Management Powers*

Respondent next invites our attention to the administrative and management powers conferred upon the trustee, particularly stressing

---

[10] In this case the aggrieved beneficiary could be, in terms of lives in being, the grantor's daughter. The fact that she is only a contingent beneficiary would not deter a New York court from hearing her plea that the trust assets are being despoiled in contravention of the trust provisions. *Klein* v. *Klein*, 64 N.Y.S. 2d 96, 98 (Sup. Ct. 1946), and the cases cited therein.

the power to allocate receipts, losses, and expenditures of the trust between income and principal. This latter provision is commonly included in trust instruments "to give the trustee some discretion so that he would not be required to seek court guidance in making doubtful allocations." *Estate of Marvin L. Pardee, supra* at 146. See also *State Street Trust Co.* v. *United States*, 263 F.2d 635, 638 (C.A. 1, 1959). The trustee herein is directed to exercise this power in an "advantageous and equitable" manner. Of course, should he abuse his discretion by classifying an obvious item of principal as income, he would be subject to equity court review. Cf. *Frances Carroll Brown*, 30 T.C. 831, 836–837 (1958) ; and *Caroline Gove Doty*, 3 T.C. 1013, 1017 (1944), affd. 148 F.2d 503 (C.A. 1, 1945).

Similarly, we find nothing unusual in the remaining administrative and management powers entrusted to the fiduciary's controlled discretion. For instance, this Court has found on more than one occasion that the power to invest in "nonlegals" (i.e., investments not classified under a particular State law or ruling of the pertinent court as legal investments for trust funds) and the power to sell or exchange the trust property do not amount to a right to designate who shall enjoy the trust property or a right to alter, amend, or revoke the terms of the trust. See *Estate of Ralph Budd*, 49 T.C. 468, 475–476 (1968) ; *Estate of James H. Graham*, 46 T.C. 415, 429 (1966) ; and the cases cited in these two opinions.

Respondent also relies on the fourth provision of the trust instrument giving the grantor's daughter the right to terminate the trust at any time before the income beneficiary attains age 25 by filing a written instrument with the trustee. We are at a loss to understand, and respondent fails to explain, how this power, which is reserved to the daughter alone, can be attributed to the grantor. It is clear from a fair reading of the statutory provisions here involved that the right or power must be reserved for the exercise of the decedent-grantor himself, either alone or in conjunction with another, before such provisions become operative. Secs. 2036(a)(2) and 2038(a)(1), I.R.C. 1954.

Finally, respondent cites *State Street Trust Co.* v. *United States, supra,* for the proposition that although none of the reserved powers in itself may require the result he seeks, when such powers are viewed as a whole, they lodge such broad discretionary authority in the grantor-trustee as to require inclusion of the trust property in his gross estate. Due to our conclusion that a New York court of equity could, and would if called upon, contain the trustee within the bounds of his equal fiduciary responsibility to every beneficiary under the trust, we do not feel that the exceptional rule of the *State Street* case here

applies. See *Estate of Willard V. King*, 37 T.C. 973, 978 (1962). Thus it is our view that, under the facts of the instant case, the whole is no greater than the sum of its parts.

In view of the foregoing, we hold that no portion of the trust property, or the income therefrom, is includable in the decedent's estate under the provisions of sections 2036(a)(2) and 2038(a)(1) of the 1954 Code.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

---

RAUM, *J.*, dissenting: I cannot agree with the result reached as to the second issue. The decedent reserved to himself, as trustee, the power to distribute principal to the income beneficiary whenever it should appear to his "satisfaction" that such beneficiary may be "in need of funds" (in excess of income otherwise then available to him) for a variety of purposes including his "welfare and happiness." In my judgment the word "happiness" is of such broad scope as to leave the grantor with virtually unfettered power to distribute principal to the income beneficiary at will. I think that the Court's attempt to read a restrictive meaning into the word "happiness" is unfounded, and that its decision in this respect is contrary to *Merchants Bank* v. *Commissioner*, 320 U.S. 256, and *Henslee* v. *Union Planters Bank*, 335 U.S. 595. It is inconceivable to me that a New York court would undertake to limit the grantor in his exercise of the sweeping power thus reserved to himself, and I do not read any of the New York cases cited in the majority opinion as confining that power within measurable standards.

The fact that the income beneficiary is also the remainderman, if he should survive, is immaterial, for the power to accelerate enjoyment, with the effect of cutting off contingencies and making certain that the income beneficiary will obtain the enjoyment of the distributed funds, is sufficient to bring the statutory provisions into play. *Commissioner* v. *Estate of Holmes*, 326 U.S. 480.

SCOTT, HOYT, TANNENWALD, and IRWIN, *JJ.*, agree with this dissent.

---

SCOTT, *J.*, dissenting: I respectfully dissent from the majority view that the decedent did not retain within the meaning of section 2036(a), I.R.C. 1954, the right to designate the persons "who shall possess or enjoy the property" which he transferred to the trust for his grandson, Edward Ford Donaldson. Because of the provision of the trust instrument that the corpus be distributed to Edward when he became 25 years of age, it was unlikely at the time of the creation of the trust

and at the time of decedent's death that any person other than Edward would ever benefit from the trust. This fact does not, however, as a matter of law distinguish this case from *Merchants Bank* v. *Commissioner*, 320 U.S. 256 (1943), which involved a trust for a life beneficiary with the remainder to go to a charity, and the majority opinion correctly does not attempt to distinguish the case on such a basis. The distinction made by the majority between the instance case and *Merchants Bank* v. *Commissioner, supra,* is that in the instant case the word "need" is a limitation on the word "happiness." In my view this distinction is not valid. I would hold a right of invasion for the beneficiary's "need of funds * * * for his * * * happiness" is indistinguishable from a right of invasion for the "happiness" of the income beneficiary.

RAUM, *J.,* agrees with this dissent.