ESTATE OF HELEN WODELL HALBACH, DECEASED, JOHN POINIER, EXECUTOR, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Halbach v. Commissioner
Docket No. 7099-76.
United States Tax Court
T.C. Memo 1980-309; 1980 Tax Ct. Memo LEXIS 275; 40 T.C.M. (CCH) 952; T.C.M. (RIA) 80309; August 12, 1980, Filed *275 In an earlier opinion to which this opinion is a supplement (see 71 T.C. 141) we found that decedent's disclaimer of an interest in a trust was a "transfer" for estate tax purposes. The issue in this supplementary opinion is whether or not this transfer was one in contemplation of death. Held: based upon all the facts and circumstances of the case the transfer was not one in contemplation of death. Wallace B. Liverance, Jr.,Geoffrey J. O'Connor,J. Frederic Taylor and Thomas C. Crane, for the petitioner. Steven I. Klein and Bernard Wishnia, for the respondent. STERRETT
SUPPLEMENTAL MEMORANDUM FINDINGS OF FACT AND OPINION STERRETT, Judge: By letter dated April 30, 1976 respondent *276 determined a deficiency in estate tax due from petitioner in the amount of $9,619,033.53. This deficiency was claimed on the basis that decedent Helen Wodell Halbach's "Disclaimer and Renunciation" of her remainder in the testamentary trust established by her father was (1) a transfer (2) in contemplation of death, thereby includable in her estate under the provisions of section 2035, I.R.C. 1954, as in effect on the decedent's death. On September 22, 1977, petitioner filed a motion to sever issues. This motion was based upon petitioner's claim that its petition raised three main substantive issues: (1) whether decedent's disclaimer and renunciation was a "transfer" within the meaning of section 2035, (2) if so, whether the transfer was in contemplation of death within the meaning of section 2035, and (3) if the transfer was in contemplation of death, whether the proper valuation date of a disclaimed interest for estate tax purposes was the date the disclaimer was executed or the date of decedent's death. Petitioner was of the view that the first and third issues were ones of law and the second issue one of fact. If the Court were to hold that the disclaimer was not a transfer *277 for estate tax purposes, then the second and third issues would be rendered moot. Petitioner therefore moved that the transfer issue be severed from the other two issues for briefing and opinion. While this motion was opposed by respondent because of delay such severance would cause in obtaining a final determination of the case, petitioner's motion was granted by Order of the Court dated October 12, 1977. Our opinion with respect to the transfer issue was filed November 9, 1978. Estate of Helen Wodell Halbach v. Commissioner,71 T.C. 141 (1978). In this opinion we held that decedent's disclaimer and renunciation was a "transfer" within the meaning of section 2035. On brief in this matter, petitioner has abandoned its valuation date claim. Thus we are here left with only the factual question of whether decedent's transfer was one in contemplation of death. FINDINGS OF FACT Some of the facts were stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Petitioner John Poinier is executor of the will of Helen Wodell Halbach. Petitioner was a resident of Gladstone, New Jersey at the *278 time he filed the petition herein. Decedent Helen Wodell Halbach, petitioner's mother-in-law, was born in New Jersey on August 29, 1890 and died August 5, 1972, a resident of Short Hills, New Jersey at the age of 81. Decedent's father Parker Webster Page, died in 1937 at the age of 87. Her mother, Nellie A.H. Page, died in 1970 at the age of 100. Decedent's sister, Lois Page Cottrell, was born July 26, 1895 and is still alive. For the most part decedent lived a comfortable life. As a young girl she grew up i a large house in Summit, New Jersey. Her father was a patent attorney who provided an above-average standard of living for his children. Mrs. Halbach spent her girlhood days, during the summer, swimming and sailing at her family's cottage on the New Jersey shore at Bay Head. Her family had a pony at their home in Summit and boats at Bay Head. The habits of athleticism decedent formed as a girl were carried on throughout her life. Decedent married Ruthven A. Wodell on June 11, 1914. They had two children, Lois Page Wodell (now Poinier), born July 14, 1916, and Webster Page Wodell, born December 12, 1921. Mr. Wodell was an attorney like decedent's father. However, *279 starting in the early 1930's, Mr. Wodell was afflicted with a debilitating case of rheumatoid arthritis which rapidly incapacitated him from the practice of law. He died in January, 1945. From the early 1930's through 1948, when decedent remarried, she supported herself and her family through the operation of a garden and landscape consulting business under the name of Wodell and Cottrell. Mrs. Cotrell handled the financial side of the business, while decedent worked the designer side. Decedent had always enjoyed gardening. The Wodell and Cottrell firm rendered decedent's heretofore hobby into a paying business. This income was supplemented by gifts from her mother. While decedent's income during these years was adequate, it was insufficient to provide her children with the same life-style that she had enjoyed while growing up. It was also insufficient to maintain the Wodell home which, at least for part of the time, was rented. On various occasions during this period and in her later years decedent indicated her wish that her children could have had the same advantages that she had enjoyed as a girl. For example, she expressed the wish that her daughter could have had the *280 same trips abroad that she had made. In 1941 Mrs. Page gave decedent a gift that made a deep impression upon her. In that year Mrs. Page's uncle Adolphe de Bary died leaving Mrs. Page certain trust funds. Mrs. Page, however, wrote decedent the following letter: Dear Helen, I am sending to Reynolds, Richardson + McCutcheon for filing in court papers transferring to you a one half interest in my share of the trust funds under Uncle Adolphe's will. The settlement by the trustees is coming up on December 23rd + this will be my Christmas gift to you. I never expected to share in this property, which came to me so unexpectedly through the tragic deaths of both de Bary and Leonie, within such a short time - My income is sufficient without it - + as Uncle Adolphe was so found of you I would like to have you enjoy it. Devotedly, Mother Decedent married Ernest K. Halbach in 1948. Mr. Halbach was, apparently, at the time an officer of General Dyestuff Corporation of New York (General Dyestuff). Decedent's financial condition improved markedly as a result of her second marriage. Mr. Halbach had been the majority shareholder in General Dyestuff starting in 1939. All the stock *281 of General Dyestuff was, however, vested in the United States Alien Property Custodian in 1942 pursuant to the Trading With the Enemy Act. In this same year, 1942, the Alien Property Custodian seized the stock of General Aniline and Film Corporation (GAF). In 1954, after an exchange of stock, the Alien Property Custodian merged General Dyestuff into GAF. In 1965 the Attorney General sold the GAF common stock for $329,000,000. The propriety of the Alien Property Custodian seizure of General Dyestuff was the subject of a suit starting in 1962 in the Counrt of Claims. Mr. Halbach died on January 24, 1958. His successors in interest and General Dyestuff's other former shareholders or their successors in interest sued the United States for their allocable share of the GAF sales proceeds. In early December 1940 Mr. Halbach, for income and estate tax reasons, had contributed all his stock in General Dyestuff to an irrevocable trust. Mr. Halbach's first wife had a life estate in the trust with remainder over to Mr. Halbach's two daughters Mary Kemmerer and Ann Bumsted. On January 3, 1950, Mr. Halbach and his daughters entered into an agreement by which 1/8 of any potential recovery *282 relating to the Alien Property Custodian seizure of Halbach's General Dyestuff stock was vested in John L. Kemmerer, Jr., Mr. Halbach's son-in-law. On December 22, 1957, just before Mr. Halbach's death, Mr. Kemmerer declared himself trustee of his 1/8 interest in any recovery for the benefit of decedent and Mr. Halbach's two daughters. Under this trust, established for valuable consideration flowing from Mr. Halbach, decedent was granted a life estate in this 1/8 interest. Throughout her life with Mr. Halbach, Mrs. Halbach was confident of the validity of his claim for a return of his stock or its value. The accuracy of Mrs. Halbach's view was borne out, as on January 26, 1970, the Court of Claims Trial Commissioner filed his report allowing recovery to the plaintiffs in their case styled Bonnar, et al. v. United States, an unreported opinion. This opinion was adopted by the Court of Claims on February 19, 1971. Bonnar, et al. v. United States,194 Ct.Cl. 103, 438 F.2d 540 (1971). By this decision, Halbach's daughters became entitled to a recovery of over $15,000,000. On August 4, 1971, a payment of $1,180,530 resulting from the satisfaction of the Bonnar *283 judgment was made to the 1957 trust. This payment constituted 62.5 percent of the total of $1,888,848 to be paid to the trust. Mr. Halbach was a man of some means even without the General Dyestuff stock. On November 5, 1959, after Mr. Halbach's death, decedent owned common stock worth $499,274, tax exempt securities worth $109,100, corporate fixed income securities worth $38,154, and miscellaneous securities worth $5,113, for a total of $651,641. After her marriage to Mr. Halbach decedent began to make gifts to her children. In the early 1950's decedent made a series of gifts to her daughter Lois Poinier which, in the aggregate, gave the Poiniers full ownership of their residence in Short Hills. In 1958 decedent gave the Poiniers a down payment of $3,000-$5,000 for a vacation home in Rhode Island. At various times throughout her remaining years decedent made gifts to, or for the benefit of, her family. Decedent was active throughout her life. She continued her gardening activities after her marriage to Mr. Halbach and, for example, designed a garden at her home. She worked in the garden almost every day throughout her remaining years. Decedent travelled each winter, *284 from the early 1950's through 1971, from her home in New Jersey to Nokomis, Florida where she would stay from one to several months. While in Florida the decedent would sail and swim in the ocean. Decedent went to Weekapaug, Rhode Island each summer where she frequently stayed for several months. Decedent enjoyed driving a car and bought a new one in 1972, the year of her death. At the same time she kept her previous car, a 1956 Chrysler. In sum, decedent enjoyed fishing, swimming, sailing, gardening, travelling, entertaining, and driving almost until the day of her death. Indeed, the day before she died she washed her new car and then entertained friends for lunch. She intended, and expected, to live as long as her mother, Mrs. Page, who lived to be almost 101 years old. In fact, approximately 7 months prior to her disclaimer, on August 31, 1969, decedent attended her mother's 100th birthday party. To commemorate this event, the townspeople of Weekapaug held a large parade on August 29, 1969, of which decedent was an organizer. At the parade decedent asked her daughter, Mrs. Poinier, if she would give her a similar parade when she reached 100 years of age. One major *285 incident marred petitioner's otherwise rather healthy life. In late 1964 decedent suffered two fainting spells ("syncopal episodes"). The problem was diagnosed as a heart valvular deficiency. On November 21, 1964, decedent had a heart operation in which her aortic valve was replaced with a prosthetic (Starr) valve. This difficult operation was attempted only because of decedent's otherwise good health and optimistic mental attitude, combined with the decedent's poor prognosis without the operation. The operation was successful. Decedent had no other syncopal episodes and the prosthetic valve functioned flawlessly until her death in 1972. Petitioner recovered well from this operation and was soon, once again, leading the sort of life described above. Decedent's long time personal physician convincingly testified to her overall improvement after the operation. While this operation was a success it did not cure all decedent's ills. Thus, there was evidence in the record that petitioner's mitral valve was not operating as efficiently as it should have. Also, after the operation decedent was required to take a variety of drugs, such as anticoagulants, a digitalis-related drug *286 to improve heart efficiency, and diuretic. From October 25, 1965 to October 31, 1965 petitioner was hospitalized for treatment of a lung embolism. She was also hospitalized from July 31, 1971 through August 3, 1971, with plumonary edema. Despite these various maladies, however, decedent remained optimistic. She cared little for doctors and hospitals and preferred to focus her attention on thoughts of life and plans for the future rather than thoughts of illness. She was never told of the potential seriousness of the mitral valve deficiency from which she possibly suffered. As found decedent was financially secure after her marriage to Mr. Halbach. In 1970, a series of events occurred which provided her with, in her view, a superfluity of income. As noted, on January 26, 1970, the Court of Claims Trial Commissioner entered his decision for plaintiffs in the Bonnar case. Decedent's interest in this case was a life estate in close to $2,000,000 should the Trial Commissioner's conclusions be adopted by the Court of Claims, as Mrs. Halbach was certain would happen. On April 14, 1970 decedent's mother, Mrs. Page, died. At that time, therefore, decedent and her sister Lois *287 P. Cottrell, who both survived their mother, each became entitled to possession of one-half the remainder of the corpus of the trust established by their father. At this time, however, petitioner already owned an estate that provided her with income sufficient to maintain the life-style to which she was accustomed and wished to perpetuate. During the first six months of 1970 she owned stocks with a fair market value as of March 31, 1970, of approximately $614,296.69, and bonds of various issue dates with face amounts totaling $173,000. Decedent's adjusted gross income for her taxable years 1969 through 1972, inclusive, was as follows: 1969
$ 23,711
1970
23,138
1971
23,471
1972 *
66,439
On April 19, 1970, therefore, five days after her mother's death decedent disclaimed and, as we have found (71 T.C. 147), thereby transferred her remainder interest in her father's trust to her children. At that time her interest in the trust had a fair market value of $10,954,717.60. At decedent's death, on August 5, 1972, these assets had a fair market value of $13,954,034.28. The Trial Commissioner's *288 conclusions were adopted by the Court of Claims, as mentioned, by an opinion dated February 19, 1971. The distribution of the assets out of the Page trust to decedent's children occurred in kind in early 1971. While decedent did not receive any income from her interest in the Bonnar decision until 1972, her income roughly trebled in that year, as can be seen above. OPINION On April 19, 1970, less than three years before her death, decedent transferred her remainder interest in a trust to her children. The sole issue for our decision is whether this transfer was one in contemplation of death. Respondent argues that the transfer was one in contemplation of death because it was made as a substitute for a testamentary disposition of property, and for the purpose of avoiding estate taxes. Petitioner argues that the transfer was motivated by thoughts of life and that the primary impetus to the transfer was to provide financial security for her children, in partial repayment of the relative deprivations she believed they had suffered as children, and at a time when decedent's income, already sufficient, was about to be trebled even without the remainder interest. Whether the *289 transfer before us was made in contemplation of death within the meaning of section 2035[1] depends upon the dominant motive impelling the transfer, which we must determine on the basis of all the facts and circumstances of the case. [2]Allen v. Trust Company,326 U.S. 630, 636 (1946); Estate of Ford v. Commissioner,53 T.C. 114, 122 (1969), affd. per curiam 450 F.2d 878 (2d Cir. 1971). A rebuttable presumption in respondent's favor exists under the statute. Section 2035(b). The presumption is one of law, rather than fact. Thus it is not itself evidence. Estate of Gerard v. Commissioner,57 T.C. 749, 757 (1972). Of course, the party challenging the Commissioner's determination has the burden of proof that the gift was not one in contemplation of death. McGaughn v. Real Estate Land Title & Trust Co.,297 U.S. 606, 607 (1936); Reeves' Estate v. Commissioner,180 F.2d 829, 831 (2d Cir. 1950); Estate of Lynch v. Commissioner,35 T.C. 142, 150 (1960). *290 The test is always to be found in decedent's motive. To fall within the statute's net the motive that induces the transfer must be of the sort that leads to a testamentary disposition. Death must be a definite concern giving rise to a definite motive. United States v. Wells,283 U.S. 102, 115 (1931). The statute does not have references to that general expectation of death such as all others entertain. Section 20.2035-1(c). On the other hand a transfer may be in contemplation of death even though the transferor does not fear imminent death. See e.g. Cleveland Trust Co. v. United States,421 F.2d 475, 478 (6th Cir. 1970); Estate of Honickman v. Commissioner,58 T.C. 132, 135 (1972). Rather, the thought of death must be the impelling cause of the transfer. United States v. Wells,supra at 118. Thus, if the gift springs from a different, non-death motive it is not one contemplated by the statute. The Supreme Court noted at 283 U.S. at 118, in its oft-cited case of United States v. Wells, that: If it is the thought of death, as a controlling motive prompting the disposition of property, that *291 affords the test, it follows that the statute does not embrace gifts intervivos which spring from a different motive. * * * It is common knowledge that a frequent inducement [to make a gift] is, not only the desire to be relieved of responsibilities, but to have children, or others who may be the appropriate objects of the donor's bounty, independently established with competencies of their own, without being compelled to await the death of the donor and without particular consideration of that event. There may be the desire to recognize special needs or exigencies or to discharge moral obligations. The gratification of such desires may be a more compelling motive than any thought of death. [United States v. Wells, at 118, 119.] Thus, we are presented with a task akin to mind-reading which is certainly not a science. To read retroactively the mind of a decedent requires a clairvoyance that borders on the supernatural; it clearly does not border on certainty. Our responsibility is to make the best possible judgment. We do so. We are taken by the testimony of those who knew the decedent well that she was a woman, while of some age, with a joie de vivre that *292 kept thoughts of death from being a motivating factor. We fin it believable that she wished her children to enjoy the advantages that she had had while growing up and that she had been unable to supply during their childhood. Once her own needs were comfortably covered, she followed a normal parental instinct to transfer her newly acquired surplus assets to the natural objects of her country. Such motivations have been clearly recognized as valid bases for making a transfer not in contemplation of death. Estate of Hutchinson v. Commissioner,20 T.C. 749, 756 (1953); Estate of Wilson v. Commissioner,13 T.C. 869, 871 (1949); Estate of Gerard v. Commissioner,supra at 759. We certainly assume that decedent was not unaware of the income and estate tax advantages of her act. Mr. Halbach himself had made an almost identical transfer in 1940, many years before he died, as had her own mother with respect to Uncle Adolphe's gift."[Every] man making a gift knows that what he gives away today will not be included in his estate when he dies. All such gifts plainly are not made in contemplation of death in the statutory sense." *293 Allen v. Trust Co. of Georgia,326 U.S. 630, 635 (1946). Nonetheless we do not perceive tax considerations as primarily motivating decedent's acts. Rather, the timing of the gift was in major part governed by the fact that, at the time she made the gift, decedent believed she would have more than sufficient income from the Bonnar recovery to maintain her life-style, and therefore she could "set up" her children without a noticeable cost to her. Then, and only then, did she make the gift. The parties make much of Mrs. Halbach's heart operation. We, frankly, believe that at least in this case the fact of the heart operation was neutral. Clearly a heart operation is a serious one. It denotes the presence of a serious heart ailment. On the other hand the operation was successful. We attach importance to the fact that Mrs. Halbach was never informed that her mitral valve was possibly faulty. Thus, it is distinctly possible that Mrs. Halbach believed her life would be lengthened by the operation, perhaps beyond even that of her mother whom she fully intended to equal in longevity, rather than shortened. Given Mrs. Halbach's active life-style and otherwise healthy *294 body and her positive state of mind after the operation, we believe that she would most likely have taken the optimistic view. It is decedent's health and state of mind at or before the time of the transfer to which we must look. Estate of Johnson v. Commissioner, 10 T.C. 680, 688 (1948). We believe that decedent's health was relatively good at the time of the transfer and that her mental outlook was excellent. The testimony of her long-time physician bears this out. Thus we would put this case in the same category as Blakeslee v. Smith, 110 F.2d 364 (2d Cir. 1940). In that case the decedent was 73 years old and in good health at the time of the transfer. The decedent was vigorous, active, and expected, as did Mrs. Halbach, to live another 15 to 20 years. The decedent's parents had lived to be 87 and 91 years of age. Finally, the decedent in the Blakeslee case had no knowledge, at the time of the transfer, of the cancer that killed him and in fact did not know of the cancer until a few days before he died. The Blakeslee court held the gift not to be in contemplation of death. Respondent also makes much of the terms of decedent's *295 various wills, and in particular the fact that she executed a new will in December of 1970, eight months after the transfer. Clearly the fact that decedent altered her wills, as her financial condition and that of her children changed, could be some evidence that her disclaimer was a substitute for a testamentary disposition. Accordingly, we have carefully reviewed decedent's wills. Petitioner executed a will on December 16, 1965 after her heart operation. Part Eight of this will dealt with the residue of decedent's estate should she survive her mother. Clearly this will contemplated that, if decedent should outlive her mother, she intended to take her remainder. On the other hand her next will, executed December 20, 1970 some eight months after the disclaimer, was no doubt executed with the knowledge that decedent no longer needed to dispose of the remainder. We do not believe these changes significant. We have already noted that we could concede that decedent was aware of the income and estate tax effects of the disclaimer. Her 1970 will confirms this. We do not believe that this fact necessarily warrants respondent's conclusion that the disclaimer and 1970 will were integrated *296 transactions. Having made the gift decedent was not required to ignore the effect of the gift on her estate. Far from viewing the disclaimer and December 20, 1970 will as being integrated, we see the will as being merely an acknowledgment of the changed conditions wrought by the disclaimer. In the case of Estate of Amy DePuy, 9 T.C. 276, 291 (1947), the decedent had died in 1941 at the age of 83. In 1930 she had suffered a heart attack. In 1935 she had a benign tumor removed. The decedent was of failing eyesight. In 1938, some eight years after her heart attack, decedent had made a gift. Immediately upon the completion of the 1938 gift she changed her will so as to eliminate a provision for the benefit of the 1938 donee. We found that "The record shows, however, that the trust was not a mere substitute for a testamentary disposition. Her main purpose was to achieve immediate objectives desirable to her during her lifetime * * *." The facts before us are, we believe, even more favorable for petitioner than were the facts in DuPuy.The DuPuy amendment had, apparently, occurred soon after the 1938 gift in trust. Substantial temporal simultaneity would *297 be a factor indicating integration of the gift in will. In our case eight months elapsed between the transfer and the new will. If decedent had died during those months, her children would have received both the majority of her estate and the disclaimed remainder. We conclude that the two transactions were not so related as to taint the disclaimer with testamentary intent. See Estate of Dinell v. Commissioner, 58 T.C. 73, 80 (1972) and Igleheart v. Commissioner, 77 F.2d 704, 710 (5th Cir. 1935). In any event it is clear that the motive impelling decedent's transfer at the time of the transfer, and not at some other time, must be the focus of our decision herein. Estate of Lowe v. Commissioner, 64 T.C. 663, 676 (1975). We conclude that lifetime motives predominated and impelled the transfer before us. It follows from the foregoing that we hold that the transfer was not one made in contemplation of death. Decision will be entered under Rule 155. Footnotes
*. Includes $53,455 from the 1957 Halbach trust.↩
1. SEC. 2035. TRANSACTIONS IN CONTEMPLATION OF DEATH. (a) General Rule.--The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, in contemplation of his death. ↩
2. For a list of relevant factors see Estate of Johnson v. Commissioner,10 T.C. 680, 686↩ (1948).