# STATE OF MICHIGAN

# COURT OF APPEALS

---

*In re* DINO RIGONI INTENTIONAL GRANTOR
TRUST FOR THE BENEFIT OF CHRISTOPHER
RAJZER.

---

DINO RIGONI,

        Petitioner-Appellant,

v

CHRISTOPHER RAJZER,

        Respondent-Appellee,

and

LORI L. PURKEY, successor trustee of the DINO
RIGONI INTENTIONAL GRANTOR TRUST
FOR THE BENEFIT OF CHRISTOPHER
RAJZER and the DINO RIGONI INTENTIONAL
GRANTOR TRUST FOR THE BENEFIT OF
DINA L. RAJZER,

        Respondent-Appellee.

UNPUBLISHED
July 14, 2015

No. 321589
Van Buren Probate Court
LC No. 20113006-TV

---

Before: SERVITTO , P.J., and BECKERING and BOONSTRA, JJ.

PER CURIAM.

       Petitioner Dino Rigoni ("Rigoni") appeals by right from the opinion and order of the trial court, entered after a bench trial, determining several issues related to his attempted substitution of the property held by the Dino Rigoni Intentional Grantor Trust for the Benefit of Christopher Rajzer and the Dino Rigoni Intentional Grantor Trust for the Benefit of Dina L. Rajzer ("the Rajzer trusts"). We affirm.

I.  PERTINENT FACTS AND PROCEDURAL HISTORY

Rigoni is the settlor of the Rajzer trusts.  Respondent Christopher Rajzer ("Rajzer") and his wife, Dina L. Rajzer, were the beneficiaries of identical trusts; when Dina Rajzer passed away in 2012, Rajzer became the beneficiary of the assets held by Dina's trust.  Lori L. Purkey ("Purkey") is the appointed successor trustee of the Rajzer trusts.

Rigoni owned approximately 551 acres of farmland in Michigan.  In 2001, Rigoni created an estate plan to convey that property to the Rajzers while minimizing tax consequences.  To that end, Rigoni created a limited liability company named Rigoni Investments, LLC, of which he was initially the sole owner.  Rigoni also created a revocable living trust for himself (the "Rigoni trust") and transferred 100% of the ownership interest in Rigoni Investments to that trust.  Rigoni then conveyed his farmland to Rigoni Investments.  Rigoni then created an "intentionally defective grantor trust"[1] for each of the Rajzers.  The trusts each contained a clause permitting Rigoni to substitute property of "equivalent value" for the trust property ("the substitution clause").

The Rigoni trust then sold a 20% membership interest in Rigoni Investments to each of the Rajzer trusts.  As consideration for the membership interests, the Rajzer trusts each tendered a promissory note in the amount of $185,416.  Rigoni also created a second limited liability company called Rigoni Asset Management, LLC ("RAM").  The Rigoni trust transferred a 1% interest in Rigoni Investments to RAM, and RAM was appointed as the initial manager of Rigoni Investments.  Later in 2001, the Rigoni trust gifted another 10% interest in Rigoni investments to each of the Rajzer trusts.

As thus established, the Rajzer trusts collectively owned 60% of Rigoni Investments (the sole asset of which was the farmland conveyed to it by Rigoni); RAM owned 1%, and the Rigoni trust owned 39%.  At the time of the estate plan, the Rajzers were already leasing the farmland from Rigoni.  A new 10-year lease was executed between the Rajzers (in their personal capacity, not by the trusts) and Rigoni Investments for $40,000 per year.  The Rajzers were in physical possession of the farmland and operated it as a farm.  The Rajzers invested $960,000 in improvements to the farmland between 1998 and 2011.  The farm was profitable and the farmland increased substantially in value: the appraisal of the farmland done in 1996 valued the property at $1,088,000, while the appraisal of the farmland conducted in 2011 valued the property at $3,980,000.

In April of 2011, Rigoni, through counsel, sent a letter to the original trustee of the Rajzer trusts, ordering the trustee, pursuant to the substitution clause, to substitute the promissory notes

---

[1] An intentionally defective grantor trust is an irrevocable trust that is considered a completed transfer for federal estate and gift tax purposes, but not for income tax purposes.  Thus, the property owned by the trust is removed from the grantor's estate for estate tax purposes, but the grantor continues to pay income tax on the taxable income of the property, reducing the grantor's gross estate.  See generally Weinberg, *Reducing Gift Tax Liability Using Intentionally Defective Irrevocable Outstanding Trusts*, 4 Journal of Asset Protection (January/February 1999).

of each trust for the 20% membership interest in Rigoni Investments which each trust had purchased. The original trustee responded that the language of the trust required substitution of property of equivalent value and that he believed that Rigoni had failed to offer property that met that criterion. Rigoni also informed the Rajzers that their lease would expire at the end of 2011 and would not be renewed.[2]

In January of 2012, Rigoni again attempted to exercise his right under the substitution clause, this time by ordering the trustee (now successor trustee Purkey) to substitute the promissory notes of each trust for the full 30% of interest in Rigoni Investments owned by each trust. Purkey responded in the same fashion as had the original trustee, stating that Rigoni had failed to offer property of equivalent value for substitution.

In April of 2012, Rigoni filed a petition with the trial court, seeking to have the court compel the trustee to allow the substitution of property in the trusts. In June of 2012, Purkey filed a petition requesting that the trial court determine the "equivalent value" of a 60% interest in Rigoni Investments.[3] The two petitions were consolidated and the matter was set for a bench trial.

Before the trial, the trial court ordered the parties to submit a statement of the issues to be decided in the proceeding. The trial court recited those issues in its final pretrial order:

> I. Whether Petitioner's exercise of his right to reacquire trust assets is inextricable [sic] tied with the requirement that, in doing so, he substitutes property of equivalent value?
>
> II. Whether Petitioner's exercise of his right to reacquire trust assets can be exercised without an agreement as to the property to be substituted or must exercise of the reacquisition of Trust Assets by Dino Rigoni be contemporaneous with the replacement of those assets with property of equivalent value?
>
> III. What is the appropriate methodology for determining the value of the 30% membership interests in Rigoni Investments held by each of the Trusts (a total of 60%)?
>
> IV. What is the value of the 30% membership interest in Rigoni Investments held by each of the Grantor Trusts?
>
> V. What is the appropriate methodology for determining the value of the two 2001 promissory notes that have twice been tendered by the Petitioner in the

---

[2] Rigoni later served the Rajzers with eviction papers. The Rajzers filed suit against Rigoni in Cass County, alleging that Rigoni had orally or impliedly promised that the lease would be renewed for a successive 10-year term. The trial court granted Rigoni's motion for summary disposition. The Rajzers did not appeal that ruling.

[3] Dina L. Rajzer had passed away by the time Purkey filed her petition.

attempted exercise of his right to "reacquire trust assets by substituting property of equivalent values"?

VI. What is the value of the two 2001 promissory notes that have twice been tendered by the Petitioner in the attempted exercise of his rights to "reacquire trust assets by substituting property of equivalent value"?

VII. Was there a promise by Dino Rigoni to leave the farm to Christopher and Dina Rajzer and did Christopher and Dina Rajzer's reliance upon that promise arise to a contractual obligation that void, [sic] trumps or otherwise waives Dino Rigoni's rights as set forth in paragraph 2.3 [the substitution clause] of the Trust?

This issue will be decided by the Court prior to any other issue and without further hearing. The deadline for filing legal briefs in this matter is Friday, September 14, 2012.

VIII. Whether property owners in the State of Michigan have the freedom to draft trust instruments that include language requiring the trustee to comply unconditionally with the grantor's written replacement instructions.

IX. Whether language in a trust instrument requiring the trustee to comply unconditionally with a grantor's written replacement instructions constitutes a "violation of law or public policy", as described by the Supreme Court in *Wilkie v Auto-Owners Insurance Co*., 469 Mich 41, 51-52; 664 N.W.2d 776 (2003).

The matter proceeded to trial. Regarding Issue VII, the trial court ruled at the beginning of trial that "whatever promises [Rigoni] made did not void, trump, or otherwise waive Mr. Rigoni's rights as set forth in paragraph 2.3 of the trust." The trial court stated that the substitution clause was enforceable as written.

At the beginning of trial, counsel for all parties agreed that the principal issue in the case was the valuation of the trust property and the tendered substitute property. The parties then presented expert testimony on valuation.

Rigoni presented his expert on valuation, David Distel, who opined that the fair market value of 60% of Rigoni Investments was $248,000. Distel reached this conclusion by applying a "discounted cash flow" approach to value. Rather than value the underlying asset held by Rigoni Investments (the farmland), Distel determined the present value of the income stream received by Rigoni Investments, i.e., income from leasing the property. Distel used the offer from the Rajzers to lease the farmland in 2012 for $125,000, as well as average agricultural and land leasing rates from a Michigan State University report as a basis for determining an income stream for 2012 through 2021. Distel then applied substantial discounts for lack of marketability (19%) and minority shareholder status (32%). Distel's analysis was premised on the assumption that the holders of the 60% interest in Rigoni Investments would not be able to reach the underlying asset (the farmland) due to the language of the operating agreement for Rigoni Investments, which required 100% agreement to effect any sale of the property and forbade members from seeking judicial dissolution of the company. Distel's report also indicated that his analysis was premised on the assumption that Rigoni's substitution rights had already been

-4-

exercised. Distel testified that he valued the 60% interest in Rigoni Investments as an intangible asset, and frequently compared it to the valuation of a note receivable.

Purkey offered the testimony of Eric Adamy, also an expert in business valuation. Adamy valued the 60% interest in Rigoni Investments at $2,388,000. This figure represents 60% of the appraised value of the farmland held by Rigoni Investments ($3,980,000), to which valuation the parties stipulated. Adamy testified that he had considered multiple methods of valuation, and concluded that the best method of valuation was the market value of the assets held by Rigoni Investments. Adamy based his conclusion in part on Internal Revenue Service Revenue Ruling 59-60, § 5(b) ("Ruling 59-60"), which states in relevant part:

> The value of the stock of a closely held investment or real estate holding company, whether or not family owned, is closely related to the value of the assets underlying the stock. For companies of this type, the appraiser should determine the fair market values of the assets of the company. Operating expenses of such a company and the cost of liquidating it, if any, merit consideration when appraising the relative value of the stock and the underlying assets. . . . For these reasons, adjusted net worth should be accorded greater weight in valuing the stock of a closely held investment or real estate holding company, whether or not family owned, than any of the other customary yardsticks of appraisal, such as earnings and dividend paying capacity.

Adamy further testified that he found it not appropriate to apply discounts for lack of marketability and minority shareholder status in this case. He opined that the fair market value standard with discounts presumes a willing buyer and willing seller, and that in this case Christopher Rajzer was not a willing seller, which affected his analysis similarly to cases involving minority shareholder oppression.

Adamy also opined that Distel's use of the discounted cash flow method of valuation was inappropriate in this instance, because Distel's method did not capture the value of the entire entity of Rigoni Investments, only its cash flow. Adamy stated that, in his opinion, "equivalent value to me means a [sic] asset that has similar characteristics in terms of risk and opportunities for rate of return." Adamy opined that the substitution of the promissory notes for the Rajzer trusts' shares in Rigoni Investments would not provide the same risk or rate of return.

Finally, Rajzer offered the expert testimony of Jeffrey Groen, an expert in business valuation and taxation. Groen did not independently value the membership interest in Rigoni Investments held by the Rajzer trusts; rather, he offered his expert opinion on the valuation methods used by Distel. Groen testified that, because Rigoni Investments was taxed as a partnership, it was possible that under the Internal Revenue Code, § 708(b)(i), Rigoni's attempted substitution might have amounted to a "sale or exchange of 50 percent or more of the total interest in partnership capital and profits" and would thus lead to the termination of the partnership. Further, because Article 5.1 of Rigoni Investment's Operating Agreement provides that "[n]o membership interest shall be disposed of if the disposition would cause a termination of the Company under the Internal Revenue Code . . . . Any attempted disposition of a membership interest in violation of this Article is null and void ab initio," the attempted substitution by Rigoni would then be void ab initio. Groen's report further stated that Rigoni

Investments may have terminated upon the death of Dina Rajzer due to the language in Article 10.1 of Rigoni Investment's Operating Agreement, which provides for dissolution upon "the occurrence of any other event that terminates the continued membership of a Member in the Company unless within ninety (90) days after the disassociation of membership . . . a majority of the sharing ratios of the remaining membership consent to continue the business of the company." Thus, Groen opined that the assumptions upon which Distel's valuation were based, i.e., that the holder of the 60% interest in Rigoni Investments could never achieve dissolution of the company and that Rigoni had already exercised his substitution rights, were flawed.

Groen further testified that Distel's analysis was not a fair market value analysis and that Distel had not vetted the assumptions provided to him by Rigoni's attorneys. Groen also testified to numerous other problems with Distel's methodology, including "double-dipping" discounts and failing to consider and apply Ruling 59-60. Groen opined that Distel's valuation analysis was not credible.

Rigoni testified that no payments had been made on the promissory notes held by Rigoni Investments from the Rajzer trusts. However, Rajzer testified that he believed that a portion of his rental payments, as well as a pro-rata portion of other income generated by the farm, were being applied by Rigoni to pay down the notes. In post-trial briefs, Rigoni assigned the notes a combined value of $518,861.40, while Rajzer assigned the notes a combined value of $226,000.00.

Following the bench trial and post-trial briefing, the trial court issued an opinion and order containing findings of fact. As to Issues I and II (interpretation of trust language), the trial court ruled that Rigoni's substitution right was "inextricably linked" with the requirement that he substitute property of equivalent value, and that "the reacquisition of Trust Assets by Dino Rigoni be contemporaneous with the replacement of those assets with property of equivalent value as agreed upon by the Trustee." As to issues III and IV (the valuation of the membership interests held by the Rajzer trusts), the trial court found Adamy's method of valuation to be correct, and that the value of the 60% membership interest was $2,388,000.00. As to Issues V and VI (valuation of the promissory notes held by Rigoni Investments), the trial court found that income from the farmland held by Rigoni Investments should have been applied to pay down the notes, and that the appropriate method of valuation was to apply the interest rate of the notes (7%) to the principal and then reduce the value by payments made on the note, and concluded that the notes' combined value was $355,493.00. The trial court noted that it had ruled on Issue VII earlier. With regard to issues VIII and IX, the trial court noted that these issues were addressed earlier in the court's opinion.[4]

This appeal followed. On appeal, Rigoni challenges the trial court's interpretation of the substitution clause and the valuation of the 60% membership interest in Rigoni Investments; Rigoni does not challenge the valuation of the promissory notes.

---

[4] Issues VIII and IX dealt with the interpretation of the substitution clause and were discussed in the trial court's discussion of issues I and II.

## II. INTERPRETATION OF THE SUBSTITUTION CLAUSE

Rigoni challenges the trial court's interpretation of the substitution clause in the Rajzer trusts, which reads:

> As Grantor, I [Dino Rigoni] do hereby retain the power and right, exercisable only for my personal benefit and only in a non-fiduciary capacity, to reacquire trust assets by substituting property of an equivalent value without the approval or consent of the Trustee or any person acting in a fiduciary capacity. The Trustee shall comply with my written expressed intentions concerning the exercise of this power.

Rigoni essentially argues that the plain language of the clause required the trustee to effect a substitution of property upon his command, and if necessary seek additional value in a later proceeding. We disagree. We review a trial court's interpretation of a trust instrument de novo on appeal. *In re Estate of Stan*, 301 Mich App 435, 442; 839 NW2d 498 (2013). The powers and duties of a trustee are determined by examining the trust instrument. See *In re Kostin*, 278 Mich App 47, 53; 748 NW2d 583 (2008). In construing a trust, "[t]his Court must attempt to construe the instrument so that each word has meaning." *Id*.

Rigoni argues that the trial court refused to give effect to the "shall comply" language in the substitution clause. Rigoni asserts that, because he did not seek to preclude the trustee from seeking additional value, that the trial court improperly found a conflict between the "shall comply" language and "equivalent value" language in the substitution clause. However, the trial court's opinion indicates that it properly gave effect to all of the language of the substitution clause when it concluded that Rigoni's "right to reacquire trust assets is inextricably linked with the requirement that in doing so, he substitutes property of equivalent value" and that the "reacquisition of Trust Assets by Dino Rigoni" must be "contemporaneous with the replacement of those assets with property of equivalent value." Nothing in the language of the substitution clause requires the trustee to accept *any* tender of property as substitution for trust assets; rather, the substitution clause prohibits the trustee from declining to comply with Rigoni's substitution of equivalent value property. A necessary precondition to that substitution is that equivalent value be established: Rigoni may reacquire "trust assets *by* substituting property of an equivalent value." (Emphasis added.) Once Rigoni has tendered property of equivalent value, the trustee lacks the discretion to deny the substitution. The trustee, however, still possessed the power and duty to determine whether the attempted substitution complied with the requirements of the substitution clause. See 3 Restatement Trusts, 3d (2007), p 55, comment d ("The primary duty of the trustee in regard to such a power is to ascertain whether an attempted exercise is within the terms of the power and to refuse to comply if it is not."). The trial court did not err in giving effect to every word of the substitution clause. *Kostin*, 278 Mich App at 53. In fact, Rigoni's argument would substantially rewrite the substitution clause by essentially causing it to read, "I may substitute any property for trust assets; if the trustee determines that the value of the property substituted was not equivalent, it may seek additional value afterwards." We decline to rewrite the unambiguous language of the substitution clause in such a fashion. See *Ourlian v Major*, 333 Mich 491, 496; 53 NW2d 346 (1952).

-7-

## III. VALUATION OF MEMBERSHIP INTEREST

Rigoni next argues that the trial court erred in accepting Adamy's valuation of the membership interests held by the Rajzer trusts. We disagree. A trial court's valuation of an asset is a finding of fact reviewed for clear error. *Jansen v Jansen*, 205 Mich App 169, 171; 517 NW2d 275 (1994). "A trial court has great latitude in determining the value of stock in closely held corporations, and where a trial court's valuation . . . is within the range established by the proofs, no clear error is present." *Id*.

Rigoni challenges the trial court's decision on two fronts: he argues that the trial court erred by essentially failing to conclude that any valuation method that considered the value of the underlying asset held by Rigoni Investments (the farmland) was fatally flawed, and he argues that in any event the chosen valuation method failed to apply appropriate discounts. We disagree in both respects.

First, although the Operating Agreement of Rigoni Investments provides that members may not seek to sell or otherwise affect the underlying asset without unanimous approval, members are not absolutely barred from ever reaching the underlying assets. To borrow an example from the bench trial, this situation is not akin to a shareholder of Ford Motor Company being precluded from taking a Mustang off the line of a Ford plant. First and most obvious is the fact that members *may* reach the underlying asset *with* unanimous approval. Second, other events, such as the transfer of a member's interest, may result in dissolution of the LLC. In short, the trial court did not clearly err, based on the proofs presented at trial, in failing to automatically discard any valuation method based on the value of the underlying asset. *Id*. The trial court's conclusion that an appropriate valuation method would value the underlying asset as well as the income stream was supported by guidance from the Internal Revenue Service in the form of Ruling 59-60, as testified to by both Adamy and Groen.

With regard to the application of discounts, Distel's use of discounts was based on the central assumption of his valuation—that a purchaser of the membership interests held by the trust was only purchasing a right to the income stream, and had no hope of ever reaching the underlying assets. Additionally, on appeal Rigoni argues that discounts were used in originally valuing the membership interests when they were purchased by the trusts, thus rendering it unfair to Rigoni that no discount would be applied on substitution. No evidence was presented at trial of precisely what discounts, if any, were used in originally valuing the notes. Attorney Kolar, the estate planner who designed Rigoni's estate plan, did not testify. Correspondence from Kolar to the original trustee states only that "for gift and transfer tax purposes, the membership interests were properly subject to a substantial valuation discount." Although there was some testimony from Adamy on cross-examination about what discounts he hypothetically might have applied to the membership interests in that situation, the trial court heard no evidence of actual discounts applied in 2001.

Adamy opined that "equivalent value" in this case required the use of fair market value without discounts. He based this conclusion in part on the fact that the Rajzer trusts were not willing sellers of the membership interests. Further, Groen testified that, for tax purposes, a substitution of property for "equivalent value" should not increase the net worth of the grantor. Such testimony is supported by Internal Revenue Service Revenue Ruling 2008-22, which

provides that a grantor "cannot exercise the power to substitute assets in a manner that will reduce the value of the trust corpus" or increase the grantor's net worth. See also *Estate of Jordahl v Commissioner*, 65 T.C. 92 (United States Tax Court, 1975) ("The trust agreement specifically provided that any property substituted should be 'of equal value' to property replaced. Decedent was thereby prohibited from depleting the trust corpus."). Application of substantial discounts to the membership interests upon their removal from the trust, when no evidence was presented that the interests were subjected to similar discounts upon their acquisition by the trust (and thus that Rigoni can essentially "buy" the interests for much less than he "sold" them), would make it highly likely that Rigoni's net worth would be increased by the substitution, and that the value of the trust corpus would be reduced.

In sum, evidence was presented to the trial court in support of its conclusion that it was appropriate in the instant case not to apply any discounts to the membership interests held by the trusts. The trial court's valuation was within the range established by the proofs. *Jansen*, 205 Mich App at 171. Accordingly, we find no clear error in the trial court's conclusion regarding valuation of the membership interests held by the Rajzer trusts. *Id*.

Affirmed.

/s/ Deborah A. Servitto
/s/ Jane M. Beckering
/s/ Mark T. Boonstra